IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SHAUN WILKINS and ROY BUCHNER,

      Plaintiffs,

vs.                                                                          CIV. No. 02-980 JH/RLP

DETECTIVE JUAN DE REYES, Albuquerque
Police Dept.; AGENT FRANK JACOBY, New
Mexico Dept. of Public Safety; SARGENT
MICHAEL FENNER, New Mexico Dept. of
Public Safety,

      Defendants.

## MEMORANDUM OPINION AND ORDER

      This matter comes before the Court on the following pending motions: (1) Plaintiffs' motion for leave to supplement response to Defendants' motion to dismiss [Doc.  No.  97]; (2) Motion by Defendants Fenner and Jacoby for partial summary judgment as to damages [Doc.  No.  162]; (3) Motion by Defendants Fenner and Jacoby for summary judgment as to liability [Doc.  No.  164]; (4) Motion by Defendant DeReyes for summary judgment on grounds of qualified immunity [Doc.  No. 166]; (5) Motion by Defendants Jacoby and Fenner for order appointing special master and lifting stay [Doc. No. 247]; (6) Motion by Defendants Fenner and Jacoby for admission of polygraph evidence from experts hired by Plaintiffs [Doc. No. 279]; and (7) Plaintiffs' unopposed motion for extension of time [Doc.  No.  281].  After reviewing the briefs and the relevant authorities, the Court concludes that Defendants' motion for partial summary judgment on damages should be granted in part and denied in part, Defendants' motion for summary judgment as to liability should be granted in part and denied in part, Defendants' motion for summary judgment on grounds of qualified immunity should

be granted in part and denied in part, and Defendants' motion for admission of polygraph evidence should be denied.   Defendants' motion for appointment of a special master should be denied. Plaintiffs' motion for leave to supplement their response to the motion to dismiss should be denied as moot, and Plaintiffs' motion for an extension of time to respond should be granted.

## LEGAL STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998).  "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim.  *See*

2

*Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983. Qualified immunity bars Section 1983 suits against defendants in their individual—but not official—capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted). The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds*, *Saucier v. Katz*, 533 U.S. 194 (2001).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate

that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The first part of this inquiry requires a court to determine whether the parties' submissions, viewed in the light most favorable to the plaintiff, could show the officers' conduct violated a constitutional right. *Cf. id.* at 201. The second part of the inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'" *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).

If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity. *See Medina*, 252 F.3d at 1128. If, and only if, the plaintiff establishes both elements of the qualified immunity test does a defendant then bear the traditional burden of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)). In other words, although the court "review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina*, 252 F.3d at 1128 (citation omitted). However, if the nonmoving party successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392,

4

1396-97 (10th Cir. 1992) (citations omitted).

## **BACKGROUND**

The facts of this case, viewed in the light most favorable to the Plaintiffs, are as follows.  At the time of the events in question, Defendant Juan DeReyes ("DeReyes") was a detective with the Albuquerque Police Department's Gang Unit.  Defendants Frank Jacoby ("Jacoby") and Michael Fenner ("Fenner") were employed by the New Mexico State Police Department at all relevant times.

On April 14, 1996, Ben Anaya, Sr., found the bodies of his son, Ben Anaya, Jr., his girlfriend, Cassandra Sedillo, and her two young sons, Johnny and Matthew Garcia, at Ben Sr.'s cabin in Torreon, New Mexico.  Forensic analysis revealed that the two adults had been shot to death approximately four months earlier, in mid-December of 2005, and that the two children had been locked in the cabin and had died of starvation and dehydration two to three weeks after the adults. At the request of the local district attorney, the New Mexico State Police assumed responsibility for the quadruple homicide investigation.  Accordingly, Jacoby and Fenner became involved in the case. When law enforcement officials realized that Ben Anaya, Jr. had been a member of Albuquerque's "18th Street Gang," they began to suspect that the murders were gang-related and asked for assistance from the Albuquerque Police Department's Gang Unit.  At that point, DeReyes became involved in the investigation.  Neither Jacoby nor Fenner had met DeReyes before that time.

Ben Anaya, Sr. had last seen his son alive on December 10, 1995 at the cabin in Torreon, where Ben Jr. was hiding out from law enforcement.  Also staying at the cabin in December of 1995 were Cassandra Sedillo and her two little boys, as well as Ben's friend and fellow 18th Street gang member Shawn Popeleski ("Popeleski"), also known as "Frank Gomez" and "Popcorn."  On April 15 and April 17, 1996, Jacoby and DeReyes interviewed Popeleski regarding the murders.  On April

5

17 and April 18, respectively, they interviewed two other members of the 18th Street gang, Lawrence Nieto ("Nieto"), also known as "Woody," and Shaun Wilkins ("Wilkins"), also known as "Sagger." In May of 1996, Defendants conducted further interviews of Popeleski and Nieto. The stories that Popeleski and Nieto told the police changed significantly over time, and Plaintiffs contend that their final stories were the result of coercion by the Defendants.[1]

In his initial interviews, Nieto denied ever being present at the Torreon cabin or knowing anything about the murders. However, in subsequent interviews by Defendants, Nieto's story underwent several significant changes. In an interview[2] on May 15, 1996, Nieto related the following description of events to Eric Lucero, a polygrapher with the New Mexico State Police. Nieto stated that in December of 1998, he had been at home when Wilkins and his friend Roy Buchner ("Buchner"), also known as "Easy," came to his house and convinced him to accompany them to the Torreon cabin in a black Trans Am. Nieto also said that he could see that Wilkins had a chrome plated .22 caliber semiautomatic pistol in his lap. On the way there, Wilkins and Buchner said that they planned to shoot Popeleski because he was a snitch. They arrived to find Popeleski at the cabin, along with Ben Anaya, Cassandra Sedillo, and the two children. According to Nieto, Wilkins and Buchner snorted cocaine with Anaya while he smoked pot and drank beer with Popeleski. Nieto said that Wilkins "got kind of crazy" after taking cocaine and urged him to shoot Popeleski. Nieto also stated that while Anaya was showing Wilkins and Buchner his guns, he informed Popeleski that Wilkins and Buchner wanted to shoot him, and that Popeleski should watch his back. Three or four

---

[1] These interviews are discussed in further detail in the discussion of qualified immunity in Section III, *infra*.

[2] At the time of this interview, Nieto was in police custody as a material witness in Santa Fe, New Mexico. He had not yet been charged with a crime.

6

hours later, Nieto, Wilkins and Buchner left the cabin, and at that time Wilkins said that they were going to "blast Popcorn" as well as steal the drugs and guns belonging to Anaya. Nieto said that when he expressed reluctance to participate, the other two told him that he would wear a mask to hide his identity. When they reached the car, all three donned masks, and Nieto was given a .12 gauge shotgun. Wilkins and Buchner were armed with a pistol and a rifle. The three waited for thirty minutes to an hour and then walked back to the cabin, where they spotted Popeleski outside relieving himself. Under Wilkins' orders, Nieto snuck up on Popeleski and held him at gunpoint. Nieto admitted that he held Popeleski to the ground and told him not to worry, that he would not shoot him. In the meantime, Wilkins and Buchner entered the cabin wearing ski masks, and Nieto heard approximately eight shots fired. According to Nieto, he then fired his shotgun in the air and told Popeleski to run. Nieto then saw Wilkins and Buchner carrying guns, cocaine, and marijuana out of the cabin. The three walked to the car, but Buchner ran back to the cabin and locked the front door. On the drive back to Albuquerque, Wilkins and Buchner laughed and said that there had been no witnesses. They stopped and burned their gloves in a trash can, warned Nieto not to say anything, and then dropped him off at home. Plaintiffs contend that Nieto's story was the product of coercion, and that Defendants pressured Nieto to fabricate his statement after coercing a similar account from Popeleski.

Eventually, based upon statements by Popeleski and Nieto, the Defendants theorized that Wilkins and his friend and fellow 18th Street gang member Buchner, were directly involved in the homicides, along with Nieto and Popeleski. The Torrance County Magistrate Court conducted preliminary hearings for Plaintiffs Wilkins and Buchner. DeReyes testified at Buchner's preliminary hearing, while Jacoby testified at Wilkins' preliminary hearing. Popeleski testified at both Plaintiffs'

7

preliminary hearings as well, while Nieto testified at neither hearing.  Both Buchner and Wilkins were represented by counsel at their preliminary hearings.  The magistrate found that probable cause existed and bound both Wilkins and Buchner over for trial. Eventually, all four of the 18th Street gang members (Nieto, Popeleski, Wilkins, and Buchner) were tried separately for the murders.

At his own criminal trial which began on July 23, 1997, Nieto testified in a manner consistent with his May 15, 1996 interview in which he accused Wilkins and Buchner of being the "trigger men" who shot Ben Anaya and Cassandra Sedillo and who then locked the children in the cabin, while he and Popeleski were present outside.  Nieto was convicted for his part in the homicides and received four consecutive life sentences.

In August of 1999, Popeleski went to trial for the murders.  He did not testify in his own defense, but in her opening statement his attorney did tell the jury that Popeleski had been truthful in his statements to the police.  The jury convicted Popeleski of allowing the children to starve to death and the robbery of Ben Anaya's automobile.  He received a sixteen and one half year sentence.

On September 22, 1997, Plaintiff Wilkins went to trial on the murder charges in state district court.  Nieto refused to testify, and therefore his May 15, 1996 videotaped statement was played to the jury.  Popeleski also refused to testify, and so his preliminary hearing testimony was played to the jury.  The jury could not reach a verdict, and the court declared a mistrial.  On November 3, 1997, Plaintiff Buchner went to trial for all four murders as well.  Nieto again refused to testify, but not before he told the jury that Defendants had forced him to say that he, Wilkins, and Buchner had been at the Torreon cabin.  He also asserted that none of them had any part in the murders.  The trial court declared Nieto unavailable to testify and admitted his May 15, 1996 videotaped statement into evidence.  Popeleski also refused to testify, and so his preliminary hearing testimony was admitted

into evidence.  Similarly, Buchner's jury could not reach a unanimous verdict, and the court declared a mistrial.

The state initially decided to retry both men.  Buchner then filed motions in limine to exclude Nieto's and Popeleski's statements at trial.  The district court ruled that Nieto's May 15, 1996 videotape could not be admitted but that Popeleski's preliminary hearing testimony would be admitted at trial.  The State appealed, and the New Mexico Court of Appeals held that the district court had to analyze each particular statement made by Nieto to determine its admissibility.  The state district court conducted that analysis, excluding most of Nieto's May 15, 1996 statement.  The State appealed this decision, and on March 21, 2000, the New Mexico Court of Appeals affirmed.  On May 25, 2000, the New Mexico Supreme Court denied certiorari.  In Wilkins' case, the state district court ruled that Nieto's statement could not be admitted at the second trial.  The State appealed, and on November 4, 1999, the Court of Appeals affirmed the state district court.  On May 2, 2000, the Supreme Court denied certiorari.

On January 1, 2001, a new District Attorney took office in New Mexico's Seventh Judicial District.  He entered *nolle proseques* in Buchner's and Wilkins' criminal cases on January 3, 2001 and March 2, 2001, respectively.  On August 8, 2002, Plaintiffs filed this lawsuit under 42 U.S.C. § 1983 asserting that Defendants violated their federal civil rights.  In Count I of the Complaint, Plaintiffs allege that Defendants coerced Popeleski and Nieto into falsely naming them as the killers, thereby violating Plaintiffs' Fourth Amendment rights to be free from unlawful seizure, their liberty interest under the Fifth Amendment, their rights to a fair trial, and their Fifth and Fourteenth Amendment due process rights.  Under Count II, Plaintiffs allege that Defendants are liable for malicious prosecution.  Because it is not clear whether Plaintiffs allege a state common law tort or

a constitutional tort, the Court presumes that they are alleging both causes of action.  Finally, in

Count III Plaintiffs allege that Defendants engaged in a conspiracy to violate their civil rights.

**DISCUSSION**

I.    **FENNER AND JACOBY'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY [DOC.  NO.  164][3]**

   A.    **Statute of limitations**

Defendants Jacoby and Fenner argue that Plaintiffs' claims should be dismissed because they

failed to satisfy the statute of limitations.  Examination of this argument reveals it to be without merit.

"State statutes of limitations applicable to general personal injury claims supply the limitations

periods for § 1983 claims. . . ." *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 557 (10th Cir.

1999).  In this case, the parties agree that New Mexico's three-year personal injury statute of

limitations, NMSA 1978 § 37-1-8 (1880), applies to Plaintiffs' claims.  However, it is well settled that

federal law governs the accrual time for Section 1983 claims.  *Id*. The parties disagree as to the date

when Plaintiffs' causes of action accrued.

Relying upon the principle that Section 1983 actions accrue when plaintiffs knew or had

reason to know of the existence and cause of the injury which is the basis for their lawsuit, *see Smith

v. City of Enid, Okla.*, 149 F.3d 1151, 1154 (10th Cir. 1998) *and Johnson v. Johnson County

Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991), Defendants contend that Plaintiffs' claims

accrued when they learned of Nieto's May 11, 1996 interview in which he accused them of

committing the Torreon cabin murders, accusations that Plaintiffs claim Defendants coerced from

Nieto.  Defendants contend that as to Buchner, this date is April 14, 1997, when his criminal attorney

_____

[3] Defendant DeReyes joins in the motion.  *See* Doc. No. 243.

10

filed a motion asking the state district court to consider a videotape of that interview in determining whether to admit evidence of Nieto's later statement to Agent Lucero.  Defendants further contend that Wilkins' claim arose on June 30, 1999, when his criminal attorney filed a motion seeking to cross examine officers regarding the contents of Nieto's May 11, 1996, interview.  Both of these dates fall outside the limitations period, since they are more than three years prior to the filing of the civil complaint on August 8, 2002.  In contrast, Plaintiffs contend that the statute of limitations began to run much later, either when the New Mexico Court of Appeals affirmed the district court's exclusion of Nieto's statements, or when the prosecutor entered *nolle proseques* as to both Plaintiffs.  Both of these dates fall within the limitations period.

The Court agrees with Plaintiffs, finding this case to be controlled by *Heck v. Humphrey* and later opinions from the Tenth Circuit Court of Appeals applying *Heck*'s principles.  In *Heck*, the plaintiff appealed his Indiana criminal conviction.  While the appeal was pending, he filed a civil lawsuit under 42 U.S.C. § 1983, seeking damages on the claim that the defendants, acting under color of state law, had engaged in unlawful acts that had led to his arrest and conviction.  The defendants argued that the statute of limitations barred his claims.  The Supreme Court held that when a state prisoner seeks damages in a Section 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence.  *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  If it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  *Id*.  This is not a matter of exhaustion of state remedies prior to asserting a federal right; rather, under *Heck* the Section 1983 cause of action simply does not exist until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus.  *Id*. at 489.  The Court

explained its rationale as follows:

> One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused. This requirement avoids parallel litigation over the issues of probable cause and guilt, and it precludes the possibility of the claimant [sic] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction. Furthermore, to permit a convicted criminal defendant to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit.

*Id*. at 484 (internal citations and quotations omitted). The Supreme Court grounded its decision in the "hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments," *id*. at 486, as well as traditional, common law tort principles. The Supreme Court did not root its analysis in the specific elements of any particular cause of action under the tort laws of any one state, as Defendants urge this Court do here. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1289 (10th Cir. 2004) ("*Heck* thus teaches that federal courts fashioning constitutional analogues to traditional common law torts should refer to the general common law tradition, rather than to the law as defined by the jurisdiction where the action originated.").

In this case, there is no doubt that during the pendency of the criminal charges against them, a victory by Plaintiffs on their claims for violation of constitutional rights, malicious prosecution without probable cause, and conspiracy would have been entirely inconsistent with any possible future criminal conviction of the Plaintiffs, as each of their civil claims rests on the premise that Defendants manufactured the criminal charges against them through coercion of Nieto and Popeleski. Therefore, it appears that under *Heck*, Plaintiffs' claims did not accrue until the conclusion of their criminal proceedings. However, Defendants contend that *Heck* does not apply in this instance because

Plaintiffs were never convicted, and therefore there was no actual conviction or sentence to be reversed, invalidated, or expunged.

Defendants' position is based upon a misreading of *Heck*. It is true that *Heck* directly addresses those situations in which a Section 1983 plaintiff has been convicted and incarcerated, rather than those in which a Section 1983 plaintiff wishes to sue during the pendency of his criminal trial, appeal, or state habeas action. However, in dicta the Supreme Court indicated that it would not be appropriate to proceed with a civil rights case while a defendant was awaiting the final disposition of the criminal case against him. *Id.* at 487 n. 8 ("For example, if a state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas action, abstention [is] an appropriate response to the parallel state-court proceedings."). Furthermore, the rationale underlying *Heck* is to prevent parallel civil and criminal litigation over the issues of probable cause and guilt, as well as the inconsistent results on those issues that may result from such parallel litigation. That rationale applies with equal force while the criminal prosecution is still pending. This logic has led the Tenth Circuit to conclude that "*Heck* should apply to such situations when the concerns underlying *Heck* exist. Thus, *Heck* precludes § 1983 claims relating to pending charges when a judgment in favor of the plaintiff would necessarily imply the invalidity of any conviction or sentence that might result from prosecution of the pending charges. Such claims arise at the time the charges are dismissed." *Beck v. City of Muskogee Police Dept.*, 195 F.3d 553, 557 (10th Cir. 1999) (citations omitted). Similarly, the Sixth Circuit Court of Appeals has directly addressed this issue in the exact context presented here, where a Section 1983 action, if successful, would imply the invalidity of a *future* conviction on a pending criminal charge. In *Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir. 1999), the court found that "the concerns of *Heck* apply pre-conviction as well as

13

post-conviction." *Id*. at 398. Thus, a plaintiff cannot "bring an action seeking damages related to the criminal proceeding brought against him until a disposition in that proceeding ha[s] been reached." *Id*. at 398-99. Indeed, the statute of limitations does not even begin to run for criminal defendants seeking to file Section 1983 claims until the disposition of any pending criminal proceedings. *Id*. at 399. Similarly, several other circuit courts of appeals have applied *Heck* to both pending and dismissed charges. *See Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999); *Washington v. Summerville*, 127 F.3d 552, 555-56 (7th Cir. 1997); *Smith v. Holtz*, 87 F.3d 108, 112-13 (3d Cir. 1996).

The Tenth Circuit's opinion in *Smith v. Gonzales*, 222 F.3d 1220 (10th Cir. 2000), upon which Defendants rely, does not alter the analysis. In that case, the State of New Mexico tried Smith for the kidnaping and murder of two women. The jury hung and the trial court declared a mistrial. The following year, a second jury acquitted Smith of the kidnaping charges but convicted him of two counts of first degree murder. On appeal, the New Mexico Supreme Court affirmed both convictions. Smith then filed a motion for post-conviction relief in the state trial court claiming that the prosecution improperly had failed to disclose exculpatory evidence. The trial court denied his motion, and Smith filed a state petition for a writ of habeas corpus, which the state trial court summarily dismissed. The New Mexico Supreme Court denied appellate review. Next, Smith filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which the federal district court dismissed. Smith appealed, and the Tenth Circuit held that the prosecution had failed to disclose several pieces of relevant material exculpatory evidence, thereby violating Smith's constitutional due process right to a fair trial. The Tenth Circuit vacated Smith's conviction and remanded the case to the district court. *Id*. at 1221. The Tenth Circuit instructed the district court on remand to enter an

14

order directing the State of New Mexico to either grant Smith a new trial or, in the alternative, to order his permanent release from custody. As a result, the State of New Mexico granted Smith a new trial and tried him for a third time. The jury could not reach a unanimous verdict, and the trial court once again declared a mistrial. *Id*. New Mexico state prosecutors filed a *nolle prosequi* indicating that they would not prosecute Smith's case further, and the State released Smith from prison on the same day. Almost three years later, Smith filed a Section 1983 action.

The question raised by this procedural marathon was when Smith's constitutional claims accrued for purposes of the statute of limitations. Relying on *Heck* and *Beck*, the Tenth Circuit concluded that Smith's claim accrued when it invalidated the final judgment in Smith's state criminal trial, vacated his conviction, and remanded the habeas case to the district court. *Id*. at 1222. The court reasoned that, as of that date, Smith's civil lawsuit would not have demonstrated the invalidity of the state conviction because the Tenth Circuit had just vacated that conviction. *Id*. As to the remaining *pending* criminal claims against Smith, the court reasoned that as a result of its holding on the habeas appeal, the prosecution would be forced to turn over the exculpatory evidence before Smith's third trial, thereby eliminating the constitutional violations at issue in Smith's second trial. *Id*. As a result, a favorable result in Smith's Section 1983 action would not have rendered invalid any future criminal judgment against him. In other words, the court concluded that as of the date of the federal remand, a civil victory for Smith would not conflict with any past or future criminal conviction. Thus, *Smith* merely applied the principles of *Heck*—which prohibits a Section 1983 action when a judgment in favor of the plaintiff would necessarily imply the invalidity of any conviction or sentence that might result from prosecution of the pending charges—to the unique circumstances of that case. However, *Smith* does nothing to change the fact that, in this case,

criminal charges were pending against Plaintiffs until January 3, 2001 (Wilkins) and March 2, 2001 (Buchner), when the prosecutor filed *nolle prosequis* on their charges.  Until those dates, a civil judgment in Plaintiffs' favor on the claims they assert in this case would have conflicted with or rendered invalid any possible future state criminal conviction for the murders.  Therefore, under *Heck*, *Beck*, and *Smith*, the dates of filing of the *nolle prosequis* are the dates when Plaintiffs' Section 1983 claims accrued.  Accordingly, Plaintiffs have satisfied the statute of limitations.

### B.     Absolute Immunity

Defendants contend that they are entitled to absolute immunity from Plaintiffs' claims against them.  The crux of all of Plaintiffs' claims against Defendants is that they conspired to use improper tactics to coerce Popeleski and Nieto to inculpate Plaintiffs, even though Defendants knew Plaintiffs to be innocent of the murders.  It is undisputed that the Defendants participated in the interviews of Popeleski and Nieto, and that DeReyes testified at Buchner's preliminary hearing.  It is also undisputed that Jacoby testified at Wilkins' preliminary hearing, signed criminal complaints against both Wilkins and Buchner, applied for arrest warrants for both Wilkins and Buchner, signed affidavits in support of both arrest warrants, and participated in the interviews of Nieto.  The question, then, is whether under the applicable federal laws the Defendants are entitled to absolute immunity for those actions.  The Court finds that, with the exception of DeReyes and Jacoby's testimony at preliminary hearings, they are not entitled to such immunity.

Title 42 U.S.C. § 1983 is written in broad terms. It purports to subject "[e]very person" acting under color of state law to liability for depriving any other person in the United States of "rights, privileges, or immunities secured by the Constitution and laws."  The Court has consistently recognized, however, that Section 1983 was not meant "to abolish wholesale all common-law

immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1967).  The section is to be read "in harmony with general principles of tort immunities and defenses rather than in derogation of them."  *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976).  Thus, the initial inquiry is whether an official claiming immunity under § 1983 can point to a common-law counterpart to the privilege he asserts.  *Tower v. Glover*, 467 U.S. 914 (1984).  If "an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court next considers whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions." *Id.* at 920.  While the Court looks to the common law for guidance, it should "not assume that Congress intended to incorporate every common-law immunity into § 1983 in unaltered form." *Malley v. Briggs,* 475 U.S. 335, 340 (1986).

Absolute immunity applies to the performance of certain functions when those functions are integral to the functioning of our adversarial judicial system.  *See Briscoe v. LaHue*, 460 U.S. 325, 345 (1983).  This Court is guided by the Supreme Court's admonition limiting the scope of absolute immunity:  "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. [The Supreme Court has] been 'quite sparing' in [its] recognition of absolute immunity."  *Burns v. Reed*, 500 U.S. 478, 486-87 (1991).  The Supreme Court has carefully circumscribed the doctrine of absolute immunity because it protects an official from liability even when the official acted with knowledge of the constitutional violation.  *Briscoe*, 460 U.S. at 345.  Testimony at adversarial judicial proceedings is the most historically grounded of these functions which merit absolute immunity. *See id.*  Accordingly, the Court find that DeReyes and Jacoby are entitled to absolute immunity only for their testimony at the preliminary hearings held in Plaintiffs' criminal cases.

17

In concluding that the Defendants are not entitled to absolute immunity for any of their other acts, the Court is guided by the Supreme Court's decision in *Malley v. Briggs*, 475 U.S. 335 (1986). In *Malley*, a Rhode Island state trooper prepared felony complaints charging plaintiffs with possession of marijuana. The complaints were presented to a state judge, accompanied by arrest warrants and supporting affidavits. The judge signed the warrants and plaintiffs were arrested, but the district attorney dropped the charges when the grand jury did not return an indictment. Plaintiffs then brought a damages action under Section 1983, alleging that the state trooper violated their rights under the Fourth and Fourteenth Amendments by applying for the arrest warrants. The state trooper argued that he should have absolute immunity because his function in seeking an arrest warrant was similar to that of a complaining witness. The Supreme Court rejected this argument, finding no support for it under the common law in place in 1871 or in public policy considerations. *Id*. at 340-41. The court also rejected the state trooper's attempt to draw an analogy between himself and a prosecutor who is absolutely immune from suit for malicious prosecution: "We do not find a comparable tradition of absolute immunity for one whose complaint causes a warrant to issue." *Id*. at 342. Rather, the Supreme Court concluded that in the case of the police officer applying for a warrant, the doctrine of qualified immunity (which was applicable in 1871) would provide adequate protection. *Id*. at 342-43. In light of *Malley*, this Court concludes that Jacoby—the officer who sought and obtained arrest warrants against both Plaintiffs, signed the criminal complaints against them, and signed supporting affidavits—is not entitled to absolute immunity from suit for those actions.

As for Defendant Fenner, he argues that because he did not testify at either preliminary hearing, did not sign either arrest warrant, and did not sign either complaint, he is "merely an

investigative officer entitled to absolute immunity." DeReyes joins in the motion at large and offers

no arguments specific to his own actions, but like Fenner he did not sign either warrant or complaint.

Accordingly, the Court presumes that the arguments applicable to Fenner apply to DeReyes as well.

However, long established federal law holds that police officers doing investigative work, such as the

interviews of Nieto and Popeleski, are entitled at most to qualified immunity; absolute immunity

simply does not apply to such investigative work.

As the Tenth Circuit has explained,

> State officials are absolutely immune from suit if they perform
> functions analogous to those of a prosecutor in initiating and pursuing
> civil and administrative enforcement proceedings. **Absolute
> immunity does not extend to actions that are primarily
> investigative** or administrative in nature but, instead, attaches only to
> actions which a prosecutor must perform while fulfilling his duty as an
> officer of the court.

*Perez v. Ellington*, 421 F.3d 1128, 1133 (10th Cir. 2005) (internal citations and quotations omitted)

(emphasis added). In *Perez*, the defendants were tax assessment officials investigating the plaintiffs'

possible tax evasion. In conducting their investigation, the defendants issued "jeopardy tax

assessments" which gave them access to plaintiffs' financial records. After some preliminary

investigation, defendants concluded that illegal conduct had occurred and issued a lien against

plaintiffs' property pursuant to the New Mexico Tax Administration Act. Upon completion of their

audit, defendants determined that there was nothing illegal about plaintiffs' conduct. However, they

did not release the liens on plaintiffs' property until more than a year later. The Tenth Circuit held

that the defendants were not entitled to absolute immunity, stating, "As a general proposition, state

officials, like Defendants acting in a merely investigatory capacity, are not entitled to absolute

immunity." *Id*. at 1133. (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("A prosecutor's

administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.")). *See also Rex v. Teeples*, 753 F.2d 840, 843-44 (10th Cir. 1985) (distinguishing between the prosecutor's quasi-judicial role warranting absolute immunity and "police-related" work not accorded such immunity); *Gregory v. City of Louisville*, 444 F.3d 725, 740 (6th Cir. 2006) ("Under the Supreme Court's functional test, the pre-trial investigatory acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions. This Court sees no reason to treat the intentional fabrication of a forensic report differently from the intentional fabrication of a police officer or prosecutor."). Other circuits have reached similar conclusions. *Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001) (noting that absolute immunity "does not shield non-testimonial conduct . . . . [P]olice officers . . . obviously enjoy no immunity for non-testimonial acts such as fabricating evidence.") (internal quotations and citations omitted); *see Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003) (declining to extend absolute immunity to a forensic examiner who allegedly falsified a forensic report).

Finally, it is of no import whether the investigative work at issue is performed by a police officer or a prosecutor. Rather, immunity decisions regarding the liability of a state prosecutor depend on "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229 (1988). Thus, there is no absolute immunity for the investigative police work (in the form of witness interviews) performed by any of the Defendants in this case.

## II.    JACOBY AND FENNER'S MOTION TO ADMIT POLYGRAPH EVIDENCE ON SUMMARY JUDGMENT AND AT TRIAL [Doc.  No.  279][4]

In this motion, Defendants ask the Court to admit evidence of polygraph tests of Plaintiffs taken during the pendency of the criminal proceedings.  In both cases, Plaintiffs took the polygraph examinations at the behest of their attorneys as part of their defenses to the criminal charges, but those examinations were never revealed to the prosecution.  However, in this civil case Magistrate Judge Puglisi ordered the Plaintiffs to produce the polygraphs in response to Defendants' discovery requests but subsequently stayed that order.  Defendants request that they be permitted to both supplement their dispositive motions with the polygraph evidence and introduce the polygraph evidence at trial.  For the reasons stated below, the motion will be denied.

In the past, the Tenth Circuit has indicated that it views polygraph tests with disfavor, at one time even adopting a bright line rule that polygraph tests offered to prove the truthfulness of a declarant are inadmissible.  *United States v. Hunter*, 672 F.2d 815, 817 (10th Cir. 1982); *Palmer v. City of Monticello*, 31 F.3d 1499, 1506 (10th Cir. 1994).  However, in 1997 the Tenth Circuit held that bright line rule to be defunct; rather, if a party seeks to admit a polygraph test, that party must satisfy the criteria for admission of expert witness testimony under Federal Rules of Evidence 702 and 403, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See United States v. Call*, 129 F.3d 1402, 1404 (10th Cir. 1997).

Federal Rule of Evidence 702 governs the admissibility of scientific expert testimony.  The rule requires a determination that the testimony (1) is based on scientific knowledge, and (2) will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

---

[4] DeReyes joins in this motion as well. [Doc.  No.  280].

The second Rule 702 requirement, that the evidence be helpful to the factfinder, is a question of relevance.  In *Daubert*, the Supreme Court set forth the framework for analyzing the admissibility of scientific evidence.  In addition to the Rule 702's requirements, *Daubert* further requires a determination of whether the proffered scientific evidence is reliable.  Under *Daubert*, courts measure reliability of scientific evidence by considering (1) whether the technique can and has been tested; (2) whether the technique has been subjected to peer review; (3) the known or potential error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained general acceptance in the scientific community.  *Id*. at 593-95.  This list is nonexhaustive and the inquiry under Rule 702 is "flexible."  *Id*. at 594.   As the Tenth Circuit pointed out, in addition to satisfying *Daubert*, polygraph evidence must satisfy both Rule 702 and Rule 403, which permits the district court to exclude evidence where its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  *Call*, 129 F.3d at 1405.

### A.    **Buchner's Polygraph**

On October 18, 1996, Dr. David Raskin performed a polygraph test on Buchner.  The testing procedure consisted of a pre-test interview, a simulation test, the running of five charts (i.e., Raskin asked each set of questions five times, taking readings for each set) in which four relevant questions were asked, and a post-test interview.  With regard to the first relevant question, Buchner denied firing any of the shots that killed Ben Anaya and Cassandra Sedillo, and Raskin opined that Buchner was being truthful.  Raskin also asked Buchner if he participated in any way in causing the deaths of Anaya and Sedillo, if he was present at the cabin when they were shot, and if he had ever been to the cabin.  Buchner denied all three questions, and Raskin opined that his denials were deceptive.

The Court will not admit the polygraph evidence at trial, nor will it consider the evidence on summary judgment. For purposes of this motion, the Court assumes without deciding that the opinion testimony regarding Buchner's polygraph passes muster under *Daubert*. However, even with that assumption, the Court concludes that the evidence should be excluded because it does not satisfy Rules 702 and 403 of the Federal Rules of Evidence.

Defendants offer Dr. Raskin's opinion testimony regarding Buchner's polygraph to show that he lied when he said that he did not participate in causing the deaths of Ben Anaya and Cassandra Sedillo, when he said that he was not present at the cabin when they were shot, and when he said that he never went to the Torreon cabin where they were killed. Defendants thus wish to undermine Buchner's credibility when he testified in the past, and presumably will testify in the future, in support of his claims for liability and damages.[5] However, the Tenth Circuit has said that "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Toledo*,

---

[5] Defendants argue that the polygraph examinations are evidence not only of Plaintiffs' credibility, but are also "factual evidence" on the issue of Plaintiffs' alleged emotional injuries because they are "psychological tests" performed on the Plaintiffs akin to the mental examinations performed by the psychologists who will testify Plaintiffs' emotional distress damages. The Court rejects this contention because the polygraph examinations clearly do not constitute factual evidence of whether Plaintiffs participated in the murders or whether they suffered damages. Rather, it is clear that Defendants offer the opinion testimony on the issue of whether Plaintiffs are telling the truth about their non-participation—that is, evidence of their credibility. Indeed, the United States Supreme Court has already rejected Defendants' argument. *See United States v. Scheffer*, 523 U.S. 303, 317 n. 13 (1998) (emphasizing that polygraph testimony is opinion testimony, not factual evidence). And as one district court has observed, "[t]he [polygraph] evidence is only proof of how the examinee reacted during the test not the event itself. If such evidence has any value, it is as it may bear on the credibility of the examinee." *Chatwin v. Davis County*, 936 F. Supp. 832, 838 (D. Ariz. 1996). However, the Tenth Circuit has cast doubt on the use of polygraph evidence for such a purpose. *United States v. Soundingsides*, 820 F.2d 1232, 1241-42 (10th Cir. 1987); *United States v. Tsosie*, 1993 WL 34780 *5 (10th Cir. Feb. 8, 1993) (admissibility of polygraph evidence is limited to a purpose unrelated to truthfulness) (unpublished).

985 F.2d 1462, 1470 (10th Cir. 1993).  This is because "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999) (quoting Rule 702).  "A fundamental premise of our criminal trial system is that "the jury is the lie detector." *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (excluding polygraph evidence) (quoting *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973)); *Call*, 129 F.3d 1402, 1406 (10th Cir. 1997) (testimony concerning credibility, such as polygraph evidence, is "often excluded because it usurps a critical function of the jury and because it is not helpful to the jury, which is capable of making its own determinations regarding credibility.").[6]  The Court concludes that, much like the excluded evidence in *Call*, the Buchner polygraph would fail to assist the jury as required by Rule 702, but would rather distract them from their essential function of evaluating credibility.

In addition, the Court concludes that the polygraph evidence should be excluded under Rule 403.  In *Call* the Tenth Circuit noted that it was appropriate to exclude the polygraph evidence because of the danger that the jury may overvalue it as a result of its scientific nature, 129 F.3d at 1406, and the Court concludes that same hazard is present here.  The danger of confusion of the issues and waste of time—important considerations under Rule 403—are particularly strong where, as here, Defendants will have an opportunity to cross-examine the Plaintiffs at trial, giving the jurors

---

[6] Defendants contend that these cases do not apply because they are criminal cases. However, the principle that the credibility of a witness is a matter exclusively in the province of the jury applies with equal force in the civil arena.  *See Escue v. N. Okla. College*, 450 F.3d 1146, 1158 (10th Cir. 2006) (finding that, with respect to a plaintiff's § 1983 claim, "[i]t is the jury's exclusive province to assess the credibility of witnesses and determine the weight to be given to their testimony.") (quoting *Lamon v. City of Shawnee*, 972 F.2d 1145, 1159 (10th Cir. 1992)).

a firsthand opportunity to assess Plaintiffs' credibility for themselves. However, introducing polygraph evidence of credibility will merely encourage the jurors to abandon their roles as "lie detectors," in favor of wholesale reliance upon the expert's interpretation of the polygraph. Thus, the evidence should be excluded as more unfairly prejudicial than probative.

The Court notes that in the years since the Supreme Court issued its opinion in *Daubert*, both the Tenth Circuit and district courts within this circuit have routinely excluded polygraph evidence under Rule 702 and Rule 403. *See, e.g., Call*, 129 F.3d at 1406; *United States v. Wilson*, 2006 WL 1618148 at *8 (10th Cir. June 13, 2006) (observing that polygraph data would have been excluded at trial under Rule 403, in part because evaluating the credibility of a witness is within the province of the jury) (unpublished); *United States v. Pickard*, 211 F.Supp.2d 1287 (D. Kan. 2002) (excluding polygraph evidence under Rule 403 because jury may be confused and may overvalue scientific results as an indication of truthfulness). Defendants rely heavily on *United States v. Galbreth*, 908 F. Supp. 877 (D.N.M. 1995), to argue that the evidence will assist the jury in accordance with Rule 702, and to argue that its probative value is not outweighed by unfair prejudice under Rule 403. However, at the time of the *Galbreth* opinion, which is not binding authority on this Court, the district court did not have the guidance of *Call*, *Wilson*, or *Scheffer*.

   **B.     Wilkins' Polygraph**

With regard to the polygraph examination of Wilkins, the Court again need not reach the *Daubert* factors because it is clear from the record that the polygraph examination would not be helpful to the jury as required by Rule 702 and Rule 403 for the same reasons outlined in the preceding discussion of Buchner's polygraph. The Court also concludes that, as to the Wilkins polygraph, there are additional reasons to conclude that it is more unfairly prejudicial than probative

and therefore should be excluded under Rule 403.  Wilkins took his polygraph test in February of 1998.  The polygrapher, Steve Martinez, asked Wilkins whether he was the one who actually killed Ben Anaya and whether he was present when Anaya was murdered.  Wilkins answered both questions in the negative.  Although Martinez cannot remember Wilkins' exact scores and has destroyed his records of the examination, Martinez testified in his deposition that he recalled having the opinion that the polygraph results were inconclusive.  In other words, Martinez could not say with any degree of scientific certainty whether Wilkins answered the questions truthfully or if he was being deceptive. The Court finds as a matter of law that this indeterminate result would not "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by Rule 702 of the Federal Rules of Evidence because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401, Fed.  R.  Evid.  Rather, the evidence is a non-factor that must be excluded because it fails to satisfy Rule 702's relevance requirements for expert testimony. Defendants urge the Court to admit the evidence on the grounds that Wilkins did not "pass" the polygraph test, presumably so that jurors could infer that Wilkins was lying when he said that he was not at the cabin and did not participate in the killings.  However, the Court holds that to allow the jury to draw such an inference when the expert himself could not make such an evaluation of Wilkins' credibility would result in unfair prejudice to Wilkins, and that such prejudice would heavily outweigh the virtually non-existent probative value of the evidence, would confuse the issues, and would mislead the jury such that the polygraph must be excluded under Rule 403 as well.

26

**III.    ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY[7] [Doc. Nos. 164 and 166]**

Next, the Court turns to Defendants' contention that they are entitled to qualified immunity against all of Plaintiffs' claims in this case.  In *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* at 818. Putting it differently, the court also stated that a claim for qualified immunity "would be defeated [only] if an official ' knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'"  *Id.* at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted).  Once a defendant asserts qualified immunity, the burden shifts, and "the plaintiff . . . [must] come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred."  *Pueblo Neighborhood Health*

---

[7] In addition to joining in Fenner and Jacoby's motion, Defendant DeReyes also filed his own independent motion for summary judgment on qualified immunity [Doc. No. 166], in which Fenner and Jacoby join.  [Doc. No. 241].  The Court considers all the parties' arguments on qualified immunity in this section of the Memorandum Opinion and Order, regardless of where those arguments were raised.

*Ctr., Inc. v. Losavio*, 847 F.2d 642, 645-46 (10th Cir. 1988) ("The plaintiff carries the burden of convincing the court that the law was clearly established."). Because the Defendants have now asserted qualified immunity, the burden shifts to the Plaintiffs, as the nonmoving parties, to (1) assert facts which, if true, would constitute a violation of their constitutional rights, and (2) demonstrate that the right violated was clearly established at the time such that Defendants would have known that their conduct violated Plaintiffs' rights. *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996).

A.    **Evidence To Be Considered By the Court**

1.    Nieto Affidavit

Plaintiffs offer the affidavit of Nieto, authored after his conviction, in which he denies playing any role in the killings or ever being present at the Torreon cabin where the murders took place. This portion of the affidavit directly contradicts Nieto's prior testimony under oath on the witness stand in his own criminal trial, where he admitted to going to the cabin and holding Popeleski at gunpoint outside while Plaintiffs went inside the cabin and allegedly shot the victims. In his affidavit, Nieto also testified to aspects of his personal background, to his mental and physical state during the questioning by police, and to statements made by the Defendants to him during the course of the questioning. These portions of Nieto's affidavit do not appear to contradict his prior sworn testimony, because the record before the Court does not show that Nieto was questioned on these issues during the course of his trial.

Defendants argue that Nieto's affidavit, which contradicts his prior trial testimony, is a sham affidavit and should be disregarded under the standards set forth by the Tenth Circuit Court of Appeals in *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). In *Franks*, the court observed that under some circumstances, an affidavit that contradicts the affiant's prior testimony may be

28

disregarded on summary judgment as an attempt to create a sham issue of fact. "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* Finding each of these factors to be satisfied, the Court agrees with Defendants that, to the extent the Nieto affidavit states that he had no involvement in the Torreon cabin murders in direct contradiction to his prior testimony under oath at trial, his affidavit is a sham affidavit that must be disregarded.

However, the Court will not disregard those portions of Nieto's affidavit that do not contradict his prior sworn testimony. Those portions of the affidavit include information regarding Nieto's age, educational background, learning disabilities, and physical condition during police questioning, as well as Nieto's assertions regarding Defendants' words and actions during the course of such questioning. The record reflects no prior inconsistent sworn testimony on these subjects, and therefore the Court will consider these portions of Nieto's affidavit when determining whether there exists a genuine material fact for trial.

2.   Streed Affidavit

In support of their motions for summary judgment, Defendants Jacoby and Fenner offer the expert report of Thomas Streed, who holds a Ph.D in human behavior. Although Dr. Streed's purported area of expertise is unclear, his curriculum vitae reveals that courts have qualified him as an expert in areas as diverse as "psychology of criminal violence and associated mental states," "officer involved use of force, police procedures, police training, supervision, and administration," and "homicide investigation, interpretation and analysis of violent crime scenes." In the body of his

report, Dr. Streed sets forth and defines six different types of coerced confessions.  Dr. Streed then

opines that as to each interview of Popeleski and Nieto, there is no evidence that Defendants

attempted to obtain a false confession or used improper police procedures.  Dr. Streed arrives at these

conclusions in most instances by comparing specific allegations of coercion contained in Plaintiffs'

complaint with the transcripts of the interviews of Nieto and Popeleski.  For example, in one portion

of the report, Dr. Streed asserts the following opinion[8]:

> The allegations expressed in the Plaintiffs' Complaint for Violation of
> Civil Rights, paragraph 39 are without merit.  These allegations state:
> "While interrogating Nieto, Defendant DeReyes told him that this case
> was personal to him."  There is no text in the transcripts that I have
> studied wherein former Albuquerque police officer Juan DeReyes said
> to Lawrence Nieto that the case was 'personal' to him.

Most of the report contains similar analysis and opinions.  Thus, the bulk of Dr. Streed's report is an

attempt to discredit the allegations in Plaintiffs' complaint by comparing those allegations with

interview transcripts.  Dr. Streed makes no effort to independently analyze those transcripts to discern

whether, under the totality of the circumstances, it appears that Nieto and Popeleski's wills were

overborne, which is the applicable legal standard in determining whether their statements were

coerced.  *See United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999).  In another portion of the

report, Dr. Streed sets forth the definition of "threat" from Black's Law Dictionary and then argues

---

[8] It is worth noting that although Dr. Streed claims that Paragraph 39 of the Complaint is
without merit, the transcript of DeReyes' May 11, 1996 interview of Nieto confirms most of the
allegations in that paragraph.  In questioning Nieto about the drive-by shooting, DeReyes says,
"That was my house, my familia.  That's personal, bro."  *See* Jacoby & Fenner Vol. 3, Ex. 5,
Sched. C at p. 20.  Later in the same interview DeReyes says, "Weasle, Shorty and Sagger
[Wilkins] are going to go down on something.  I had to sell my house, bro, because of that, had to
move my family because of that."  *Id*. at p. 27.  Though the Court has not scrutinized each of Dr.
Streed's opinions regarding the content of the record for accuracy, this example instills little
confidence in the correctness of his statements.

that the statements made by Defendants were not threats under that definition.  This entire section of the report is in the vein of a legal *argument* typically offered by counsel, but it bears little resemblance to an opinion offered by an expert with specialized knowledge.

Rule 702 of the Federal Rules of Evidence provides that expert testimony is admissible when the expert is able to offer "scientific, technical, or other specialized knowledge" that will assist the Court or the trier of fact to understand the evidence.  The Court will not consider Dr. Streed's report because it fails to meet this standard.  The Court is capable of reviewing (and has in fact spent considerable time reviewing) the voluminous videotapes, audiotapes, and transcripts of the interviews at issue in this case and determining whether they contain the specific threats and offers of leniency as alleged by Plaintiffs in their Complaint.  Such a process, though arduous and time consuming, requires no expert with specialized knowledge or training under Rule 702.  Furthermore, after conducting that analysis and determining what the Defendants actually said in the interviews, the Court must apply the legal standard for evaluating whether Nieto and Popeleski's confessions were involuntary, a legal standard defined by the Tenth Circuit and the Supreme Court.  Dr. Streed may not opine as to what circumstances render a confession involuntary because that would constitute an impermissible legal opinion by an expert.  *See Berckeley Inv. Group, Ltd. v. Colkitt*, --- F.3d ----, 2006 WL 2052228 at *19, (3d Cir. July 25, 2006) ("[A]n expert witness is prohibited from rendering a legal opinion.").  Therefore, the Court will exclude Dr. Streed's report from its consideration of the motions for summary judgment.

**B.**    **Is There Evidence of Coercion in Violation of Clearly Established Law?**[9]

The crux of all of Plaintiffs' claims in this case is their contention that Defendants improperly coerced testimony from Nieto and Popeleski and then used that testimony to initiate criminal proceedings against Plaintiffs. Plaintiffs claim not only that Defendants' alleged coercion violated their constitutional rights under the Fourth, Fifth, and Fourteenth Amendments (Count I), but also that the Defendants conspired to violate those constitutional rights by conducting improper interrogations (Count III). Plaintiffs also contend that, absent the improperly coerced testimony, Defendants lacked probable cause to initiate criminal proceedings and are therefore liable for malicious prosecution (Count II), and that as a matter of law the allegedly coerced statements may not form the basis for probable cause. Thus, all of Plaintiffs' claims turn on the question of whether, in order to survive a motion for summary judgment, there is sufficient evidence to support Plaintiffs' claim that the Defendants improperly coerced testimony from Nieto and Popeleski and used it against Plaintiffs in violation of Plaintiffs' constitutional rights.[10] "Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost." *Golino v. City of New Haven*, 950 F.2d

---

[9] Defendants' briefs contain little, if any, substantive analysis of this question, which requires a detailed examination of the interviews of Nieto and Popeleski conducted by Defendants. Instead, Defendants argue in summary fashion that there is no evidence of coercion.

[10] Were this a criminal proceeding, the Court would have the duty to make a pretrial determination of whether, as a matter of law, Defendants had violated Plaintiffs' constitutional rights such that Nieto and Popeleski's statements should be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963). However, in this civil case the Court must merely determine whether the facts, viewed in the light most favorable to the Plaintiffs, demonstrate a constitutional violation of clearly established law.

864, 871 (2d Cir. 1991) (citations omitted).

It has long been clearly established that "the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude in our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'" *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)).  Further, if officers use false evidence, including false testimony, to initiate charges or to secure a conviction, the defendant's Fourteenth Amendment due process rights are violated. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Chambers v. Florida*, 309 U.S. 227, 228 (1940).

The threshold question in this case, however, is whether Plaintiffs' own constitutional rights were violated by Defendants' use of the allegedly coerced statements of third parties who implicated Plaintiffs.  The Court concludes that in May of 1996, when the arrest warrants were issued and the district attorney filed criminal complaints against Plaintiffs, it was clearly established law that a criminal defendant's constitutional rights were violated by the use against him of the coerced confession of a third party.  First, Defendants do not dispute that this right was clearly established during the relevant time period.  Second, shortly after the interrogations at issue in this case, the Tenth Circuit issued its opinion in *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997).  In that case, the Tenth Circuit reviewed the denial of qualified immunity to police defendants who had elicited a coerced confession in 1993 and used it against the plaintiff.  The court held that "because the evidence is unreliable and its use offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person." *Id*. at 1157-58.  Because

the Tenth Circuit has held that principle was clearly established in 1993, it could apply no less to the interrogations, arrests, and trials conducted just a few years later in this case.

The next question is whether, when viewing the evidence in the light most favorable to the Plaintiffs, they have presented sufficient facts from which the jury could conclude that Defendants coerced inculpatory statements from Nieto and Popeleski. The Court makes this determination in light of clearly established law as it stood in April and May of 1996.

In determining whether a defendant's will was overborne in a particular case, the Court must assess the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamante*, 412 U.S. 218 (1973). With regard to the former, some of the factors taken into account have included the youth of the accused, *e.g., Haley v. Ohio*, 332 U.S. 596 (1948) (15-year old defendant); his lack of education, *e.g., Payne v. Arkansas*, 356 U.S. 560 (1958) (accused attained only 5th grade), *Clewis v. Texas*, 386 U.S. 707, 712 (1967) (same); or his low intelligence, *e.g., Fikes v. Alabama*, 352 U.S. 191 (1957) (defendant still in third grade at age 16, and psychiatric testimony showed that he was "highly suggestible," while his mother described him as "thick headed"); his mental health, *Fikes*, 352 U.S. at 196 (defendant possibly suffering from mental illness); and his physical condition, *Greenwald v. Wisconsin*, 390 U.S. 519, 520-521 (1968) (per curiam) (accused deprived of food and high blood pressure medication during questioning).

As to the details of the interrogation, the Court must consider not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), but also the lack of any advice to the accused of his constitutional rights, *e.g., Davis v. North Carolina*, 384 U.S. 737 (1966) *and Haynes v. Washington*, 373 U.S. 503, 516-517 (1963); the lack of counsel, especially in view of the

accused's statement that he desires counsel, *see Johnson v. State of New Jersey*, 384 U.S. 719, 730-31, 735 (1966); the length of detention, *e.g., Chambers v. Florida*, 309 U.S. 227, 230-31 (1940) (accused detained for five days) *and Ashcraft v. Tennessee*, 322 U.S. 143, 153-154 (1944); the repeated and prolonged nature of the questioning, *e.g., Ashcraft*, 322 U.S. 143 (36 continuous hours) *and Leyra v. Denno*, 347 U.S. 556, 561 (1954); and the use of physical punishment such as the deprivation of food or sleep, *e.g., Reck v. Pate*, 367 U.S. 433, 441 (1961).  That a defendant was not physically tortured does not preclude a finding of coercion because "the will is as much affected by fear as by force."  *Payne*, 356 U.S. at 566.

It is clearly established that threats of harm to the accused or his family, as well as promises of leniency or of protection from harm in return for a statement, constitute improper coercion.  For example, in *Griffin v. Strong*, 983 F.2d 1540 (10th Cir. 1993), the Tenth Circuit held that where defendant had (1) suggested that the plaintiff would not be able to see his daughter, (2) promised plaintiff lesser punishment, and (3) promised to protect plaintiff's health and safety in order to induce him to make a statement, that statement was involuntary.  In reaching this conclusion, the Tenth Circuit relied upon Supreme Court precedent requiring that a confession be voluntarily and freely given, without any promises or threats by the government.  *Id*. at 1543 ("The central consideration in determining whether a confession has been coerced always involves this question: did the governmental conduct complained of 'bring about' a confession 'not freely self-determined?'") (quoting *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 348 (1963)).  Based upon this rationale, the Tenth Circuit has long looked askance at confessions obtained by promises and threats, finding that statements made under those circumstances are not the product of free will.  Rather, "[i]ncriminating statements obtained by government acts, threats, or promises that permit the

35

defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment . . . ." *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991) (citing *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)).

Finally, in order to prevail on their Section 1983 claims against the Defendants, Plaintiffs must demonstrate that the Defendants acted with deliberate or reckless intent; mere negligence is insufficient. *See Webber v. Mefford*, 43 F.3d 1340, 1342 (10th Cir. 1994) ("[A] government official violates an individual's Fourteenth Amendment rights by injuring his or her life, liberty, or property interest with deliberate or reckless intent.").

With these principles in mind, the Court reviews the evidence in the record to determine whether the evidence, viewed in the light most favorable to the Plaintiffs, demonstrates that Defendants deliberately or recklessly coerced Nieto and Popeleski's statements, thereby violating their constitutional rights, and whether Defendants should have known that their actions violated clearly established law.

### 1.    Interviews of Lawrence Nieto

At the time of Nieto's interviews in the early spring of 1996, he was eighteen years old.  He attended school until the 9th grade and was in special education classes.  Nieto Aff., Ex. 1 to Doc. No. 216, at  4.  He had difficulty learning and reading.  *Id*.  He got his nickname, "Woody," from family and friends because he is "not really that bright."  Nieto trial testimony, Jacoby & Fenner, Vol. 4, Ex. 10, at p. 756.

On April 17, 1996[11], Jacoby and DeReyes interviewed Nieto after reading him his *Miranda*

---

[11] Plaintiffs claim that Defendants threatened to harm Nieto's brother if he did not give them the confession they wanted.  However, the Court's examination of the audiotape and transcript of the interview reveals no such threat.  Rather, the only reasonable interpretation of the

rights. Jacoby & Fenner Vol. 2, Ex. 3, Sched. P. At the conclusion of the interview, DeReyes told

Nieto, "And if I find out that you're lying to me and you wasted our time bro, I tell you, I'll come

looking for you personally, and I'll jack you and I'll charge you with an open count of murder and

conspiracy." *Id*. at p. 37.

On May 11, 1996, DeReyes and Fenner interviewed Nieto again. The video/audiotape and

the transcript of the interview indicate that some portions of the interview began before the tape

began recording. Jacoby & Fenner Vol. 3, Ex. 5, Sched. C. Furthermore, the interview took place

in the morning of May 11 after Nieto had been up all night "partying," a fact known to the

interviewer(s). *Id*. at p. 31. Nieto can be seen yawning during several portions of the interview. At

the outset of the interview, Nieto twice unequivocally expressed his desire to talk to a lawyer. *Id*.

at pp. 2 ("I want to talk to a lawyer right now."), 3 ("I want a lawyer …"). However, Defendants

did not stop the questioning for Nieto to talk to counsel; instead, DeReyes implied that Nieto was not

entitled to talk to an attorney because he had not yet been charged a crime. *Id*. at pp. 2-4 ("You

want to talk to a lawyer about what, bro? … Why do you want a lawyer if you haven't been charged?

… Well, how can you request a lawyer if you haven't been charged?).[12]  *See also* Nieto Aff. at ¶ 14

---

evidence is that Defendants warned Nieto that the same people who killed Ben Anaya were out to
get his brother. *Id*. at p. 36 ("Q. Do you want to see your brother get hit, you want to see your
brother go down like Ben? A. No, sir. Q. Bro the same people that hit Ben, they're going to hit
your brother . . . ."). However, in his Affidavit Nieto stated that he "was told by DeReyes and the
State Police Officer that the word would be let out that my brother was a snitch, and that he and
my family would be killed if I did not go along with this story." Nieto Aff. at ¶ 11. Though
Defendants challenge the credibility of the statements in Neito's Affidavit, it is not the function of
the Court to make credibility determinations on a motion for summary judgment, but rather to
view the facts and evidence in the record in the light most favorable to the Plaintiffs.

[12] The Court is aware that the New Mexico Supreme Court determined that at the time of
the May 11, 1996 interview, Nieto was not in custody, his *Miranda* rights had not yet attached,
and therefore this denial of the opportunity to speak to counsel was not a violation of his

("I had already asked for a lawyer, and they told me that I didn't need one, so I was sure I had no way to get any help at all.").

Defendants also made offers to help Nieto with his legal troubles and to ensure his physical protection in exchange for information on Wilkins' involvement in the murders. *Id*. at pp. 18 ("We want to help you, bro. We'll help you. You'll get a new life. You'll get out of town, because I'll tell you right now, Woodrow, I got three felonies on you right now, homie."), 22 ("I'm going to give you squina, and you're going to owe me big time, Woodrow, because I'm going to keep your ass alive."), 27 ("And you're going to be gone, bro. You're going to disappear. Isn't that right, Woody?"). *See also* Nieto Aff. at ¶ 15 ("I also got assurances that if I did so, nothing would happen to my family or to me. They talked about moving us away to protect us, and even mentioned helping us to go to live in Taos.").

DeReyes also indicated that he thought Nieto was involved in the drive-by shooting at his home, and, viewing the evidence in the light most favorable to the Plaintiffs, one could infer that DeReyes implied that he would harm Nieto unless he pinned the drive-by and the murders on Wilkins.

> Q.   It was my house. That was my crib, bro. That was my house, my familia. That's personal, bro. I don't go to your pad. I don't go to anybody's pad unless it's business.
> A.   Yes, sir.
> Q.   And I will fuck with anybody, and the child's dead.
> A.   Yes, sir.
> Q.   Respeco.
> A.   I know. That's what I'm saying. I didn't (inaudible).
> Q.   You call that respecto, bro? You broke that respecto right now when you

---

constitutional rights requiring suppression of his statements. *State v. Nieto*, 2000-NMSC-031 ¶ 20-22, 129 N.M. 688 (2000). However, the denial of his request to speak to an attorney still may be considered as one of several factors under the totality of the circumstances in determining whether his statement was involuntary. *Johnson v. State of New Jersey*, 384 U.S. 719, 730-31, 735 (1966).

went to my house and did that shit. And I always knew they'd get you, bro. And I
suspected someone, and I've been looking, bro, and I found out who it was, and I
wanted you to tell me who that person was. I tell you about it, and you're going to
pin this dude up, bro. You're going to pin him up, not only on the homicide, on the
homie, but you're going to pin him up on the drive-by, him, Shorty, and Weasle.

*Id*. at pp. 20-21. In addition to the foregoing, DeReyes made other statements which, viewed in the

light most favorable to the Plaintiffs, implied that he wanted to pin the murders on Wilkins as revenge

for the drive-by on his home, and that the only way for Nieto to help himself was to say that Wilkins

was involved:

> Q.      [Y]ou're going to give me a statement, bro, on your word that Sagger, Weasel
> and Shorty did the drive-by, just like you told me.
> A.      All right.
> Q.      And you're going to also say in that statement, about the other stuff, that you
> know that Sagger and Easy went up to the cabin in a stolen car the day that this
> happened. And that's how you're going to clear yourself, bro, because when I go to
> court on this to present that, they're going to ask you for that, and they're not going
> to ask for my word, your word. . . Because that's the only way it's going to happen,
> and *that's the only way it's going to keep you alive, bro.*

*Id*. at p. 29 (emphasis added). Defendants also implied that if suspicion rested on Nieto (something

that would happen if he did not give a statement against Wilkins), Nieto would not be able to be with

his unborn child. *Id*. at p. 46 ("If it comes back that you did this shit, we're going to come back with

a warrant and we're going to pick you up, and we're going to say, 'Woodrow, somebody else is

going to have to be with your kid until you get out of jail.'").

The Court finds that, when viewed in the light most favorable to the Plaintiffs and in applying

the "totality of the circumstances" test established by the Supreme Court and the Tenth Circuit,

Nieto's statements inculpating Plaintiffs were coerced and therefore their constitutional rights were

violated. At the time of the interviews, Nieto was relatively young and uneducated, and the only

evidence in the record on the issue shows him to be of below-average intelligence. He asked for an

attorney but was essentially told by Defendants that he did not need one.  At the May 11, 1996 interview, Nieto was questioned for many hours without having slept the night before, a fact known to Defendants.  Defendants offered him and his family help and safety if he cooperated and gave them the statement they wanted, but also implied that his cooperation (and their resulting protection) was all that would keep Nieto alive.  Defendants also implied that Nieto could lose the right to be with his child in order to exert influence over him.  *United States v. Tingle*, 658 F.2d 1332, 1336-37 (9th Cir. 1981) (finding statements involuntary where interrogation sought to cause fear that suspect would be separated from her child for a long time).  Viewed in the light most favorable to the Plaintiffs, the foregoing indicates that Nieto's statements were coerced.

Furthermore, the Court finds that as of the spring of 1996, the law was clearly established such that Defendants should have reasonably known that their actions violated Nieto's (and Plaintiffs') constitutional rights.  All of the Tenth Circuit and Supreme Court cases discussed herein with regard to the factors that a court should consider when determining voluntariness under the totality of the circumstances were issued prior to Nieto's interviews.  There was no question at that time that a jury could find that threats of harm, as well as promises of help, leniency, and safety, are improperly coercive tactics, particularly when used against a young, uneducated defendant who has been denied the opportunity to talk to a lawyer.  Further, on this record the jury could infer that Defendants acted with either deliberate or reckless intent.  Accordingly, Defendants are not entitled to qualified immunity as to the questioning of Nieto.

2.   Interviews of Shaun Popeleski

At the time of each of the interviews in this case, Popeleski was unaccompanied by legal

counsel and was either eighteen or nineteen years old.[13]  Jacoby & Fenner Vol. 2, Ex. 3, Sched. K at

p. 4.  He is originally from Korea, and at the time of the interviews he had been in the United States

between five and a half and six and a half years.  *Id*. at p. 5.  He took special courses in English as a

second language, *id*. at p. 14, and stopped attending school in the ninth grade.  *Id*. at p. 13.

Defendants DeReyes and Jacoby, who conducted the first interview of Popeleski on April 15, 1996,

therefore were aware of this background information during all subsequent interviews.  DeReyes and

Jacoby interviewed Popeleski a second time on April 17, 1996.  The record before the Court reveals

no coercive conduct by Defendants at either the April 15 or April 17 interview[14], and at both of these

interviews Popeleski denied having been present for the murders.

DeReyes and Fenner conducted a third interview of Popeleski on May 10, 1996.  Jacoby &

Fenner Vol. 3, Ex. 5, Sched. A. Viewed in the light most favorable to the Plaintiffs, the transcript of

that interview reveals that DeReyes made various promises to Popeleski in return for Popeleski giving

him information about the killings.  For example, it appears that DeReyes offered to take Popeleski

to Mississippi to escape retribution from fellow gang members. *Id*. at pp. 9 ("You guys told me from

the start that you were going to take me to Mississippi."), 21 ("I can get your butt out, out of this

---

[13] Popeleski provided two different dates of birth to police.  In his May 10, 1996 interview, he admitted that the first date of birth he provided was incorrect.

[14] Plaintiffs point to some comments by Defendants that the Court finds to have no bearing on the issue of coercion.  For example, Plaintiffs rely upon Jacoby's statement to Popeleski at the conclusion of the April 15, 1995 interview that "as far as anybody's concerned, I'm your attorney."  Jacoby & Fenner Vol. 2, Ex. 3, Sched. K at p. 96.  However, reading and hearing the statement in context, it is clear that Jacoby was writing out his contact information for Popeleski on a blank sheet of paper, rather than handing him his official card, so that no one would know that Popeleski had spoken to the police and that Jacoby was telling Popeleski that he could tell others that Jacoby was his attorney, rather than a policeman.  At this stage, Popeleski did not ask for and was not denied an attorney.

41

whole mess and sent to Mississippi and nobody will ever hear of Popcorn again."), and 52 (same). DeReyes also made vague threats against Popeleski, who initially claimed no personal knowledge of the incident, if he didn't make a statement about the murders.  *Id*. at pp. 12 ("I told you already that I'm going to hang your ass if you lie to me."), 15 ("I want to know why and who did it today. You're not going to leave this place until you tell me.  You're not." and "If you don't tell me, I'm going to burn your butt to the ground with The M.[15]  I'm going to do you hard, bro.").  Some of those threats were not direct threats by DeReyes himself, but rather "reminders" to Popeleski about what sort of treatment he could expect in prison without DeReyes' help.  *Id*. at p. 41 ("And I tell you right now, Bro, your butt is dead if you hit the pinta.  You won't make it through the pinta.").

DeReyes also implied that he could smooth things over with the district attorney on other charges pending against Popeleski or help him in other ways, provided he gave DeReyes the information he wanted.  *Id*. at p. 16 ("And all these charges that you're looking at, they all depend on me talking to the DA, period."), 20 ("[R]ight now the only thing you've got, Homes, that's keeping your ass, is me. . . . Then you start talking, Bro, or your ass is out on the line by yourself. You're back to BCDC."), 36 ("You're already screwed.  I'm trying to get you out of this."), 54 ("You better start talking, Homes.  Convince me otherwise, because I am your savior, Homes.  I am the one that's going to get you out, or the one that's going to put you back [in jail]."), and 112 ("[T]he only way you're going to get out of this is you're going to have to convince me otherwise"). The videotape of this interview also shows DeReyes at times standing over and shouting at Popeleski, who is seated the entire time and crying for significant portions of the interview.  At no time during

---

[15] Based upon the context of this and other references to "The M" (pronounced "eme") contained in the interview, the Court assumes this to be a prison gang.

the videotape of this interview does Popeleski admit knowledge of what happened on the day of the murders.

Fenner and an unknown questioner conducted the fourth and final interview of Popeleski the following day, on May 11, 1996. In this short videotape, which begins mid-interview, Popeleski asserts that he was urinating outside the Torreon cabin when he was approached by two masked men, one of whom he recognized as Wilkins by his voice and by a tattoo. In the interview, Popeleski relates how the second man held him on the ground at gunpoint while Wilkins and possibly others went into the cabin, at which time he heard five shots. Then he heard the running footsteps of his assailants. Popeleski admits running from the scene and driving away in Ben Anaya's jeep. There are no obvious signs of coercion by Defendants in the tape of the May 11 interview.

Viewing all of the evidence in the light most favorable to the Plaintiffs and with regard to clearly established law as it stood in the spring of 1996, the Court finds that Popeleski's statements were involuntary. Like Nieto, he was young, unrepresented by counsel, and had limited education. He also had lived in the United States for only a portion of his lifetime and spoke English as a second language. However, most egregious are the promises of help and safety, as well as the threats of harm, used by Defendants to secure Popeleski's statements. The cases cited above demonstrate that a jury could conclude that Defendants' use of these tactics was improper such that Defendants reasonably should have known that they were violating Popeleski's rights, which were quite clearly established by then-existing caselaw. Further, on this record the jury could infer that Defendants acted with either deliberate or reckless intent. Accordingly, Defendants are not entitled to qualified immunity for their questioning of Popeleski.

43

## C.   Claims Under the Fifth Amendment

Plaintiffs have pled a violation of two rights under the Fifth Amendment: that their due process rights were violated by the use against them of coerced testimony, and that their liberty interests were violated by their incarceration in the state penitentiary while they awaited their criminal trials.

DeReyes argues that Plaintiffs' Fifth Amendment claims must fail, relying upon *Chavez v. Martinez*, 538 U.S. 760 (2003), in which the Supreme Court held that coercive questioning of a suspect did not violate the Self-Incrimination Clause of the Fifth Amendment, absent the use of the suspect's compelled statements in criminal case against him.  Because Nieto's allegedly coerced testimony was not used against him at his own criminal trial, argue Defendants, there is no Fifth Amendment violation.  However, *Chavez* is inapplicable here because Plaintiffs do not allege a violation of the Self-Incrimination Clause of the Fifth Amendment.  Rather, their claims rest on the Due Process Clauses of the Fifth and Fourteenth Amendments, as well as their right to liberty.  *See id*. at 773.  ("Our views on the proper scope of the Fifth Amendment's Self-Incrimination Clause do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances.").  In fact, that is what Plaintiffs are claiming in this case—that their due process rights were violated by the use of coerced statements against them—and they have come forward with sufficient evidence to withstand a motion for summary judgment on this issue.

Defendants also move for summary judgment on Plaintiffs' claim that Defendants violated

their liberty interests by causing their incarceration at New Mexico's state penitentiary, which Plaintiffs allege to be "the most restrictive prison environment then available in the State of New Mexico," Complaint at ¶ 72. However, Defendants contend that they are entitled to summary judgment on this claim because the undisputed evidence demonstrates that the assistant district attorney, Madeline Melka, was solely responsible for the decision to move Plaintiffs from the facilities where they were being held to the state penitentiary. Depo. of Madeline Melka, attached as Ex. L to Doc. No. 168. Plaintiffs have neither come forward with evidence to create a factual dispute on this matter nor have they responded to Defendants' argument. Accordingly, the Court concludes that Defendants did not violate Plaintiffs' constitutional rights by causing their incarceration in the penitentiary and that they are entitled to summary judgment on that claim.

## IV.   MOTIONS FOR SUMMARY JUDGMENT ON COUNTS II AND III [Doc. Nos. 164 and 166]

### A.   Malicious Prosecution (Count II)

#### 1.   State Law Claim for Malicious Abuse of Process

In support of his motion for summary judgment on the state common law claim for malicious abuse of process, DeReyes argues that the Plaintiffs failed to satisfy the two-year statute of limitations under the New Mexico Tort Claims Act. However, as explained above, Plaintiffs' claims did not accrue until the filing of the nolle proseques in early 2001. Plaintiffs filed their complaint in August of 2002, well within the two year period. Accordingly, the state law claim for malicious abuse of process is timely. However, DeReyes also contends that Plaintiffs failed to satisfy the elements of the tort of malicious abuse of process under New Mexico state law. *See* Doc. No. 167 at pp. 17-20. Plaintiffs do not address this argument or indicate in any way that they are pursuing this state law

claim. Accordingly, the Court deems this claim to be waived, and Defendants are entitled to summary judgment on malicious abuse of process under New Mexico state law.

2.    Section 1983 Malicious Prosecution Claim

In the Tenth Circuit, courts must "take[] the common law elements of malicious prosecution as the 'starting point' for the analysis of a § 1983 malicious prosecution claim . . . [T]he ultimate question, [however], [is] whether the plaintiff has proven a constitutional violation." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996); *see also Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) ("It is generally accepted that the common law of torts is the starting point for determining the contours of a malicious prosecution claim under § 1983."). The Tenth Circuit has held that "federal courts fashioning constitutional analogues to traditional common law torts should refer to the general common law tradition, rather than to the law as defined by the jurisdiction where the action originated." *Pierce v. Gilchrist*, 359 F.3d 1279, 1289 (10th Cir. 2004).

This Court has discussed in detail the elements of a Section 1983 claim based on malicious prosecution. *See Chacon v. Watson*, No. CIV 03-438 JC/ACT, Memorandum Opinion and Order at 9-12 (D.N.M.), filed May 7, 2004 (Doc. No. 21) and *Zamora v. City of Belen*, No. CIV 03-743 JB/RLP, Memorandum Opinion and Order at 23 (D.N.M.), filed April 27, 2005 (Doc. No. 97). Malicious prosecution claims consist of three elements: (i) that the defendant must have "initiated" the allegedly malicious action; (ii) that "the original action must have terminated in favor of the plaintiff;" and (iii) that "there must have been no probable cause to support the original arrest, continued confinement, or prosecution." *Chacon v. Watson*, Mem. Op. at 11. Without proof of each of these essential elements, a § 1983 malicious prosecution claim fails as a matter of federal law.

In the Tenth Circuit, it is not clear whether a malicious prosecution claim includes a specific

intent element and, if so, what *mens rea* is required.  *See Pierce v. Gilchrist*, 359 F.3d at 1297 &

n.12.  In analyzing the elements of a malicious prosecution, the Tenth Circuit addressed malice, but

also included a footnote:

> Neither party has questioned the applicability of malice as an element
> of a § 1983 claim, and we therefore have no occasion to address the
> issue. *See Franks [v. Delaware]*, 438 U.S. at 155-56 . . . (employing
> a standard of "knowingly and intentionally, or with reckless disregard
> for the truth," falsifying or omitting evidence, in the context of Fourth
> Amendment challenges); *Arizona v. Youngblood*, 488 U.S. 51, 55 . .
> . (1988)(requiring a showing of "bad faith" in the context of due
> process challenge to failure to preserve evidence); *see also Stewart [v.
> Donges]*, 915 F.2d at 581-83; *Wolford [v. Lasater]*, 78 F.3d at 489;
> *cf. Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc)(equally
> divided court)(considering whether the failure of police to provide
> exculpatory evidence is actionable under § 1983 in the absence of
> specific intent).

*Pierce v. Gilchrist*, 359 F.3d at 1297 n.12.  *See also id.* at 1293 ("There is some disagreement in

these cases over what degree of intent the officer must have, but if it is true that [the state actor]

maliciously withheld exculpatory evidence and fabricated inculpatory evidence, . . . her actions would

satisfy even the most demanding standards put forth by the courts.").

        a.      Initiation of the Action

Defendants contend that they did not initiate the criminal actions against Wilkins and Buchner

and therefore cannot be held liable for malicious prosecution.  Though Jacoby prepared the affidavits

for Plaintiffs' arrest warrants as well as the criminal complaints against them, he argues that his

actions were superceded by the criminal informations filed by the district attorney's office, and

therefore it was that office that "initiated" the criminal actions.  The Tenth Circuit disagrees, taking

a much broader view of what it means to initiate an action.  In *Pierce v. Gilchrist*, 359 F.3d 1279

(10th Cir. 2004), the Tenth Circuit interpreted this element of the malicious prosecution claim by

relying upon the Restatement (Second) of Torts.  The Court observed that a defendant who takes an active part in procuring or continuing criminal proceedings can be held liable, even if a third party formally initiated the proceedings:

> As the *Restatement* indicates, "[a] private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself *or by another* is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." Restatement (Second) Torts § 655 (emphasis added). The comments to this section note that it "applies ⋯ when the proceedings are *initiated by a third person*, and *the defendant, knowing that there is no probable cause for them, thereafter takes an active part* in procuring their continuation." *Id.*, cmt. b.

*Id.* at 1292 (emphasis added). The Court further noted that under federal standards, it is enough to have caused another to be subjected to the deprivation of constitutional rights, and that this principle extends beyond the individual who formally initiates process.  *Id.*  Rather, "officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions."  *Id.*

Viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that they have presented sufficient evidence to create a question of fact on this element of the malicious prosecution claim.  The arrest warrants and criminal complaints drafted by Jacoby are based primarily on the interviews of Wilkins and Fenner, and in turn the Court has found that those interviews present a question of fact on coercion.  In light of his involvement in the investigation, and particularly in view of his preparation of the warrants and complaints, it is clear that Jacoby played an active role in the initiation of the criminal actions against the Plaintiffs.  However, because of their knowledge of, presence at, and participation in those interviews, the Court concludes that there is sufficient

48

evidence from which a jury could infer that DeReyes and Fenner not only cooperated in the alleged coercion, but also in bringing the criminal cases forward. Based upon this record, the jury could also reasonably infer that all Defendants aided in the continuation of the criminal proceedings despite knowledge of the lack of probable cause to support the charges. Accordingly, this element is satisfied.

b.     Termination in favor of the Plaintiffs

Defendants contend that Plaintiffs cannot satisfy this element of the tort of malicious prosecution because (1) at trial, the state district court denied their respective motions for directed verdict, and (2) those trials resulted in hung juries rather than acquittals. However, as the Tenth Circuit has pointed out, such a narrow definition of this concept "would be inconsistent with federal constitutional standards." *Pierce*, 359 F.3d at 1294. Thus, the Court turns to Section 659 of the Restatement (Second) Of Torts (1976)—the same authority relied upon by the Tenth Circuit when interpreting the requirement that a defendant have "initiated proceedings" against the plaintiff—for guidance in interpreting this element of the tort. The Restatement provides:

> Criminal proceedings are terminated in favor of the accused by
> (a) a discharge by a magistrate at a preliminary hearing, or
> (b) the refusal of a grand jury to indict, or
> (c) *the formal abandonment of the proceedings by the public prosecutor*, or
> (d) the quashing of an indictment or information, or
> (e) an acquittal, or
> (f) a final order in favor of the accused by a trial or appellate court.

*Id*. § 659 (emphasis added). "The usual method by which a public prosecutor signifies the formal abandonment of criminal proceedings is by the entry of a nolle prosequi." *Id*. § 659, com. e. *See also*

*Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (noting that the majority rule provides that a nolle prosequi dismissal terminates a proceeding in favor of the accused "unless the abandonment is for reasons not indicative of the innocence of the accused) (citing Restatement (Second) of Torts §§ 659, 660, 661 (1977)).

In this case, the prosecutor abandoned the actions against both Wilkins and Buchner by filing a nolle presequi in each case.  The two documents are virtually identical and state that both juries were hung (with the additional note that Buchner's jury voted 8 to 4 in favor of acquittal), that the State's case relied upon two statements of co-defendants and that the more incriminating of those statements (Nieto's) had been suppressed while the other (Popeleski's) was full of "major inconsistencies," that there is no physical evidence linking either Wilkins or Buchner to the commission of the crimes, that after the first trials the jurors interviewed in both cases indicated that the State's case was very weak even with the now-suppressed statement, and that "it is the State's opinion that currently there is insufficient evidence upon which to retry the defendant[s] for these crimes."  Jacoby & Fenner Vol. 4, Ex. 19.  In light of the foregoing, the Court concludes that the State not only abandoned its charges against Wilkins and Buchner, but it also determined that it lacked sufficient evidence to convict them even with Nieto and Popeleski's statements.  In accordance with Section 659 of the Restatement and the majority rule, the criminal actions were terminated in favor of the Plaintiffs.

c.    No Probable Cause

The third element of the constitutional tort of malicious prosecution is lack of probable cause.  As to this element, Plaintiffs bear the burden of showing that Defendants coerced inculpatory evidence or suppressed exculpatory evidence, and that these actions were necessary to the finding of

probable cause: that without the allegedly falsified inculpatory evidence, or with the withheld exculpatory evidence, there would have been no probable cause for their continued confinement or prosecution. *Pierce*, 359 F.3d at 1295 (citing *Stewart v. Donges*, 915 F.2d 572, 582 n. 13 (10th Cir. 1990); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996); and *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The Supreme Court further stated in *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), that "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." As the Supreme Court has explained, the substance of probable cause "is a reasonable ground for belief of guilt. . . [I]t has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal quotations omitted). Furthermore, the officer's belief of guilt must be particularized with respect to the person to be seized. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

To determine whether the Defendants had probable cause to arrest Plaintiffs, the Court must examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity. *Romero v. Fay*,

45 F.3d 1472, 1476 (10th Cir. 1995).  "This principle may appear to be in some tension with the
equally established principle that 'it is a jury question in a civil rights suit whether an officer had
probable cause to arrest.'"  *Cortez v. McCauley*, 438 F.3d 980, 991 (10th Cir. 2006) (quoting
*DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990)).

      Here, the Court has already concluded that a fact issue exists as to whether Defendants
coerced statements from Nieto and Popeleski and used them against Plaintiffs in violation of
Plaintiffs' constitutional rights.  If those statements were indeed involuntary, then the officers who
carried out the alleged coercion could not reasonably rest their determination of probable cause upon
those statements.  On the other hand, if Defendants did not coerce the statements from the witnesses,
then it would be proper for Defendants to not only consider the statements, but also to base their
determination of probable cause on those statements.[16]  Thus, if a determination of probable cause
turns solely on Nieto and Popeleski's statements, then a fact question exists on this element of the
malicious prosecution claim.

      However, if the totality of the circumstances demonstrate the existence of probable cause
based solely upon evidence known at the time to Defendants *other than* Nieto and Popeleski's
statements, then the malicious prosecution claim must fail.  For example, if an arrest warrant affidavit
contains false statements, "the existence of probable cause is determined by setting aside the false
information and reviewing the remaining contents of the affidavit."  *Wolford v. Lasater*, 78 F.3d 484,
489 (10th Cir. 1996)   Where information has been omitted from an affidavit, the Court should
determine the existence of probable cause "by examining the affidavit as if the omitted information

---

[16] Indeed, if Defendants did not coerce Popeleski and Nieto's statements and therefore
could reasonably rely upon them, there is no doubt but that those statements also are a sufficient
basis for a finding of probable cause to arrest Plaintiffs for the murders.

had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Taylor v. Meacham*, 82 F.3d at 1561 (quoting *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996)).  It appears that the only other evidence against Plaintiffs in the Defendants' possession at the relevant time were the polygraphs of Wilkins, Nieto, and Popeleski conducted by police during their investigation[17], as well as the "observation Captain Fenner made at the crime scene on April 15, 1996 of a spot on the ground where it appeared someone had tripped and fallen while running."  Doc. No. 164 at ¶116.  This evidence was excluded from arrest warrants and supporting affidavits for Wilkins and DeReyes.  However, in accordance with *Taylor* and *Wolford*, the Court should determine whether Defendants would have had probable cause even if Jacoby had included this information in his affidavits.

The Court concludes that, standing alone without Nieto and Popeleski's statements, this evidence is insufficient to establish probable cause to arrest and charge Plaintiffs with the murders. The polygraphs of Nieto and Popeleski indicate that they were truthful when they denied killing Ben Anaya, Cassandra Sedillo, and the children, but also indicated that they were deceptive when they said that they were not present for the killings and did not know who the killer was.  However, these polygraph results do nothing to connect Plaintiffs to the murders; in fact, they mean little outside the context of Nieto and Popeleski's statements.  The same can be said of the spot on the ground that Fenner observed in April of 1996, which he believes looks like someone "tripped and fell while running."  Putting aside for the moment the fact that the evidence is relatively ancient and therefore of limited probative value—virtually anything or anyone could have caused this spot in the dirt

---

[17] Fenner polygraphed Popeleski on April 19, 1996 and May 10, 1996, and he polygraphed Wilkins on April 24, 1996.  New Mexico State Police agent Eric Lucero polygraphed Nieto on April 24, 1996.

outside the cabin during the four months that passed between the murders in December of 1995 and the commencement of the investigation in April of 1996—it only implicates Plaintiffs to the extent it corroborates Nieto and Popeleski's claim that Popeleski was pinned to the ground by a masked Nieto. Absent those statements, it does nothing to link Plaintiffs to the crime. That leaves only Fenner's opinion regarding Wilkins' polygraph, which Fenner claims indicated that Wilkins was deceptive when he said that he did not commit the murders. Though one may consider polygraph evidence in examining the totality of the circumstances surrounding the question of probable cause, *see, e.g., Bennett v. City of Grand Prairie*, 883 F.2d 400, 405-06 (5th Cir. 1989), *Gomez v. Atkins*, 296 F.3d 253, 264 n. 8 (4th Cir. 2002), the Court has found no case in which a court has upheld a finding of probable cause on polygraph testimony alone. *See, e.g., Guardiola v. Texas*, 20 S.W.3d 216, 222 (Ct. App.--Hous. 2000). Therefore, the Court concludes that without Nieto and Popeleski's allegedly coerced statements, Defendants lacked probable cause to arrest Plaintiffs.

### d.    Mens Rea

As stated above, the Tenth Circuit has not yet stated what mens rea is required to establish a claim for malicious prosecution under Section 1983. However, the court has held that as to other civil rights claims under Section 1983, a plaintiff must demonstrate that the defendant acted with deliberate or reckless intent; mere negligence is insufficient. *See Webber v. Mefford*, 43 F.3d 1340, 1342 (10th Cir. 1994). In *Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992) , the court stated that "reckless intent is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." This Court concludes that, viewing the evidence in the light most favorable to the Plaintiffs, the jury could conclude that

54

Defendants knew or should have known of the obvious risk that coercive interrogation techniques were highly likely to lead to false confessions and inaccurate inculpatory statements, and that Defendants acted in unreasonable disregard of the consequences to the Plaintiffs. This conclusion is supported not only by those facts discussed in Part III of this Memorandum Opinion and Order, but also by statements by DeReyes in his May 11, 1996 interview of Nieto from which the jury could infer that he wanted Nieto to name Wilkins as the murderer in retaliation for Wilkner's participation in the drive-by shooting at DeReyes' home. *See* Jacoby & Fenner Vol. 3, Ex. 5, Sched. C at pp. 19-22, 27-29.

Accordingly, the Court concludes that Plaintiffs have come forward with sufficient evidence to withstand Defendants' motion for summary judgment on their malicious prosecution claim.

**B.      Conspiracy to Violate Civil Rights (Count III)**

A conspiracy constitutes an agreement to do an unlawful act. *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Thus, "a conspiracy [ ] requires the combination of two or more persons acting in concert." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994) (quoting *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir. 1990)) (internal quotations omitted). In order to plead a conspiracy claim, "[a] plaintiff must allege, either by direct or circumstantial evidence, a meeting of the minds or agreement among the defendants." *Id.* (quoting *Abercrombie*, 896 F.2d at 1231) (internal quotations omitted). *See also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (finding that to prove a conspiracy under Section 1983, a plaintiff must show a meeting of the minds among various defendants to violate his constitutional rights). Because "direct evidence of a conspiracy is often hard to come by[,] . . . conspiracy convictions may be based on circumstantial evidence, and the jury may

infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action." *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005).

Defendants allege that the Plaintiffs have failed to come forward with evidence in support of their conspiracy claim. However, when the evidence in the record is viewed in the light most favorable to the Plaintiffs, it demonstrates that the Defendants worked together closely in this investigation, often conducting their interviews and other interactions with Plaintiffs, Nieto, and Popeleski in each other's presence and keeping each other informed of their actions. *See* Fenner Aff., Jacoby & Fenner Vol. 3, Ex. 5 at ¶ ¶ 27, 34, 36, 49, 53, 54, 56, 68, 80, 89, 90, 100, 102 , 104-107, 138; Jacoby Aff., Jacoby & Fenner Vol. 2, Ex. 3 at ¶ ¶ 36, 39, 52, 53, 60, 61, 69, 75, 91. Thus, the jury could reasonably infer that all three Defendants were aware of, participated in, and agreed to the coercive interrogation techniques discussed in other portions of this Memorandum Opinion and Order that arguably deprived Plaintiffs of their constitutional rights. Accordingly, the motion for summary judgment on this claim will be denied.

## V.    MOTION FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES [Doc. No. 162][18]

In this motion, Defendants seek to prevent Plaintiffs from recovering two categories of damages: (1) their attorneys' fees incurred during their criminal prosecutions, and (2) all damages incurred after the dates when Plaintiffs were bound over for trial or the dates when the district attorney filed criminal informations against Plaintiffs.

It is undisputed that Wilkins was represented by the public defender in his criminal proceeding, and that the public defender's office has taken no action to preserve any right it may have to recover the costs of that representation from damages that Wilkins may recover in this case.

---

[18] DeReyes joins in this motion as well. [Doc. No. 244].

Similarly, it is undisputed that Buchner's grandfather paid Buchner's attorney fees in the criminal case and that he and Buchner have no agreement, formal or informal, for repayment of those funds. Accordingly, Plaintiffs concede that neither of them is entitled to receive their criminal attorney's fees as damages in this case.

Next, Defendants argue that they "are not liable for any damages suffered by the Plaintiffs after their preliminary hearings and certainly no later than when their criminal informations were filed by the district attorney." [Doc. No. 163 at p. 6].  They argue that assistant district attorney Madeline Melka was involved in the criminal investigation and assisted in drafting the criminal complaints against Plaintiffs, and that she and district attorney Ron Lopez exercised independent prosecutorial discretion in obtaining indictments of Plaintiffs and proceeding with their prosecutions.  In essence, this is the same argument advanced by the defendants in *Pierce v. Gilchrist*, *supra*, and in *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990).   Like the Tenth Circuit in *Robinson*, the Court finds Defendants' argument that their misconduct is shielded by the acts of the prosecutor to be disingenuous. The prosecutors' actions did not make an intervening break from the conduct of the Defendants, because the prosecutors based their decisions largely upon the allegedly falsified statements and testimony obtained by the Defendants:

> [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision . . . If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.

*Id*. at 656 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).  Thus, the

prosecutors' decisions do not insulate Defendants here.

However, Defendants also contend that "[t]he District Attorney's office was aware of all of the evidence in this case, including the polygraph results and the evolution of Nieto's and Popeleski's statements. A prosecutor was even present at some of the interviews." [Doc. No. 164 at pp. 63-64]. Thus, argue Defendants, the record is clear that the prosecutors were not defrauded, unlike the situations presented in *Robinson* and *Pierce*. In support of this contention, they rely upon the deposition testimony of assistant district attorney Madeline Melka. However, Ms. Melka's deposition actually leaves open to question which interviews she and Mr. Lopez had contemporaneously witnessed, reviewed on videotape, or read the transcripts of prior to authorizing the arrest and subsequent prosecution of Plaintiffs. Melka Depo., Jacoby & Fenner Vol 1, Ex. 2, at pp. 19-22, 26, 31-32, 45-46. Rather, Ms. Melka seemed unsure which interviews she relied upon in going forward with the arrests and prosecution. Again, viewing the evidence in the light most favorable to the Plaintiff, the Court finds room in the record to infer that Defendants failed to convey all pertinent information from the interviews to the prosecuting attorneys (particularly their use of potentially coercive tactics and the possibility that they produced false statements), thereby violating Plaintiffs' constitutional rights.

Defendants' motion for summary judgment will be granted as to Plaintiffs' claim for recovery of attorney's fees for the underlying criminal cases, and denied as to Plaintiffs' claim for damages after the dates when they were bound over for trial and when the district attorney filed their respective criminal informations.

**VI.    JACOBY AND FENNER'S MOTION FOR ORDER APPOINTING SPECIAL MASTER AND LIFTING STAY   [DOC. NO. 247][19]**

This motion will be denied in its entirety.  The Court finds that grounds for appointment of a special master to ferret out an alleged "fraud on the court" do not exist in this case.  Rather, the Court concludes that Defendants' concerns can be adequately addressed through monitoring of discovery practices by Defendants and the filing of discovery motions as they deem necessary.  Thus, the Defendants' motion for appointment of a special master under Rule 53 will be denied.

Furthermore, having concluded that expert opinion testimony regarding Plaintiffs' private polygraph tests will be inadmissible at trial, the Court denies Defendants' motion to lift the stay on production of that evidence.

**VII.    OTHER MISCELLANEOUS MOTIONS**

Plaintiffs' motion for leave to supplement their response to Defendants' motion to dismiss [Doc. No. 97] is moot, because on June 1, 2005, the Court denied Defendants' motion to dismiss. Plaintiffs' unopposed motion for extension of time [Doc. No. 281], in which they sought an extension of time to respond to Defendants' motion regarding the admission of polygraph evidence, will be granted as the motion was unopposed and the Court has considered Plaintiffs' response brief herein.

**IT IS THEREFORE ORDERED** that:

**(1)**    Plaintiffs' motion for leave to supplement response to Defendants' motion to dismiss [Doc. No.  97] is **DENIED AS MOOT**;

**(2)**    Motion by Defendants Fenner and Jacoby for partial summary judgment as to damages [Doc. No.  162] is **GRANTED IN PART** as to Plaintiffs' claim for attorney's fees in the criminal case and

---

[19] DeReyes joins in the motion.  [Doc. No. 249].

**DENIED IN PART** as to Plaintiffs' claims for damages after the district attorney filed criminal informations against Plaintiffs;

**(3)** Motion by Defendants Fenner and Jacoby for summary judgment as to liability [Doc. No. 164] is **GRANTED IN PART** only insofar as Defendants Jacoby and DeReyes are entitled to absolute immunity for their testimony in Plaintiffs' criminal preliminary hearings, and in all other respects the motion is **DENIED**;

**(4)** Motion by Defendant DeReyes for summary judgment on grounds of qualified immunity [Doc. No. 166] is **GRANTED IN PART** only insofar as

      a) All Defendants are entitled to summary judgment as to Plaintiffs' state law claim for malicious abuse of process, and

      b) All Defendants are entitled to summary judgment on Plaintiffs' claim of violation of their liberty interests as a result of their incarceration in the New Mexico State Penitentiary, and

in all other respects the motion is **DENIED**;

**(5)** Motion by Defendants Jacoby and Fenner for order appointing special master and lifting stay [Doc. No. 247] is **DENIED**;

**(6)** Motion by Defendants Fenner and Jacoby for admission of polygraph evidence from experts hired by Plaintiffs [Doc. No. 279] is **DENIED**; and

**(7)** Plaintiffs' unopposed motion for extension of time [Doc. No. 281] is **GRANTED**.

**UNITED STATES DISTRICT JUDGE**

60