IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SHAUN WILKINS and ROY BUCHNER,

          Plaintiffs,

vs.                                                                                     Civ. No.  02-980 JH/RLP

DETECTIVE JUAN DeREYES, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' joint renewed motion for summary judgment on qualified immunity based on newly discovered evidence [Doc. No. 318]. In ruling on this motion, the Court has considered the arguments of counsel and, to the extent admissible, the evidence provided by the parties. After reviewing all of those materials and the applicable law, the Court concludes that the motion should be denied.

**FACTUAL AND PROCEDURAL BACKGROUND**

The facts of this case have been set forth in this Court's Memorandum Opinion and Order entered August 16, 2006 [Doc. No. 293], as well as in the opinion of the Tenth Circuit in *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 1998). Accordingly, the Court will not repeat them here.

This is Defendants' second motion for qualified immunity. In its August 16, 2006 Memorandum Opinion and Order, this Court denied Defendants' first motion for qualified immunity on the grounds that, *inter alia*, if one viewed the evidence in the light most favorable to the Plaintiffs, one could conclude under the totality of the circumstances that Defendants coerced statements from Lawrence Nieto and Shawn Popeleski inculpating Plaintiffs in the murders of two

adults and two young children at a rural cabin near Torreon, New Mexico. Defendants appealed that ruling to the Tenth Circuit, which remanded the case to this Court for consideration of the Supreme Court's opinion in *Wallace v. Kato*, 549 U.S. 384 (1997) and its impact on Plaintiffs' substantive due process and malicious prosecution claims. On February 13, 2008, this Court entered a supplemental Memorandum Opinion and Order finding that under *Wallace*, Plaintiffs' substantive due process claim was not timely and should be dismissed. This Court's August 16, 2006 rulings remained unchanged in all other respects. Then, on June 13, 2008, the Tenth Circuit affirmed this Court's ruling on Defendants' motion for qualified immunity as to the malicious prosecution claim. Defendants appealed to the United States Supreme Court, which denied certiorari on March 2, 2009. Shortly thereafter, on April 1, 2009, Defendants filed the renewed motion for qualified immunity that is currently before the Court.

## DISCUSSION

**I.   NATURE OF THE MOTION**

The threshold issue before this Court is the manner in which to treat Defendants' motion, which they have styled as a *renewed* motion for summary judgment. In their response, Plaintiffs argue that the motion should be treated as one for reconsideration of the Court's prior summary judgment rulings. However, the Defendants argue that they may renew their motion for summary judgment on grounds of qualified immunity without being subject to the requirements of either Rule 59(e) or 60(b) of the Federal Rules of Civil Procedure.

The Tenth Circuit has stated that district courts have discretion to revise interlocutory orders prior to entry of final judgment. *Price v. Philpot*, 420 F.3d 1158, 1167 n. 9 (10th Cir. 2005) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."); *Anderson v. Deere & Co.*, 852 F.2d 1244, 1246 (10th Cir. 1988) (citing Fed. R. Civ. P.

54(b)).  Plaintiffs suggest that, although final judgment had not yet been entered in this case, this Court's discretion to revise its interlocutory orders is limited by the standards for reviewing a post-judgment motion filed pursuant to Rule 59(e) or 60(b) of the Federal Rules of Civil Procedure. However, the Tenth Circuit's opinion in *Raytheon Constructors Inc. v. ASARCO*, Inc., 368 F.3d 1214, 1217 (10th Cir. 2003) indicates that those rules do not apply to an order that is not final.

In *Raytheon*, the plaintiff moved for reconsideration prior to the entry of final judgment. The district court treated the motion as a Rule 60(b) motion, even though it acknowledged that the plaintiff was seeking reconsideration of an interlocutory order rather than a final judgment. *Id*. at 1216. The Tenth Circuit concluded that "[t]he district court was incorrect to treat Raytheon's motion for reconsideration under Rule 60(b), which only applies to final orders or judgments." *Id*. at 1217. *See also Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n. 1 (10th Cir. 1991) (noting that a motion for reconsideration filed prior to final judgment "was nothing more than an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment."). In light of these precedents, the Court concludes that it has the general discretionary authority to review its prior Memorandum Opinions and Orders regarding Defendants' motion for summary judgment on the grounds of qualified immunity, which were interlocutory, and it is not bound by the stricter standards for considering a Rule 59(e) or Rule 60(b) motion.

Plaintiffs also argue that the law of the case doctrine requires the Court to apply the more stringent requirements used for Rule 59(e) and Rule 60(b) motions. "As most commonly defined, the [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983).  Because this case involves possible consideration of new

3

facts[1] and does not involve a change in the district court's application of any rule of law, the law of the case doctrine is not applicable. *See generally Major v. Benton*, 647 F.2d 110, 111-12 (10th Cir. 1981) (discussing application of law of the case doctrine to district court's decision to reverse a prior interlocutory order and reach different conclusions of law).

Nonetheless, the Court has reviewed its prior decisions and remains convinced that its interpretation of the facts presented in briefing of the earlier motion for summary judgment was correct in light of governing law requiring it to construe those facts in the light most favorable to the Plaintiffs. Thus, the questions now before the Court are (1) whether it may consider the new evidence presented by the Defendants for the first time in the present motion, and (2) if so, how that new evidence impacts Defendants' claim to qualified immunity. The Court takes each question in turn.

## II.     ADMISSIBILITY OF NEW EVIDENCE

In deciding a motion for summary judgment, the Court can accept evidence only that would be admissible if offered in court. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment[.]"). Thus, the preliminary issue facing the Court is whether it may properly consider the newly discovered evidence presented by Plaintiffs.

### A.     NIETO'S NOLO CONTENDERE PLEA

The first piece of newly discovered evidence upon which Defendants rely is a plea entered by Lawrence Nieto on September 19, 2007. A jury had convicted Nieto in New Mexico state district court for his involvement in the murders, but after his conviction he filed a habeas corpus

---

[1] Defendants state that they are renewing their motion based on "newly discovered evidence." Doc. No. 318 at 1.

4

proceeding, also in state court. That habeas proceeding was pending at the time Nieto signed his April 27, 2004 affidavit ("Nieto Affidavit"), which Plaintiffs provided to this Court in support of their response to Defendants' original motion for summary judgment on grounds of qualified immunity. In that affidavit, authored after his conviction, Nieto denies playing any role in the killings or ever being present at the Torreon cabin where the murders took place. This portion of the affidavit directly contradicts Nieto's prior testimony under oath on the witness stand in his own criminal trial, where he admitted to going to the cabin to commit a robbery and holding Popeleski at gunpoint outside while Plaintiffs went inside the cabin and allegedly shot the victims. In ruling on the Defendants' first motion for summary judgment, the Court disregarded this portion of Nieto's affidavit as a sham because it contradicted his earlier sworn testimony at his own criminal trial. However, the affidavit also contains testimony regarding Nieto's personal background, his mental and physical state during the questioning by police, and statements made by the Defendants to him during the course of the questioning. These portions of the affidavit were not contradicted by Nieto's prior sworn testimony. Deeming those uncontroverted statements not to be a sham under Tenth Circuit precedent, the Court considered them for summary judgment purposes.

On May 22, 2007, while this case was at the Tenth Circuit on interlocutory appeal of the qualified immunity decision, the state court granted Nieto's petition for habeas corpus and ordered that a new trial should be set. Then, on September 19, 2007, Nieto appeared again in state district court to enter his no contest ("nolo contendere") plea to two counts of second degree murder and one count of armed robbery. This hearing occurred more than eleven years after the Defendants had last had contact with Nieto. At the hearing Nieto said that he had read and understood the written plea agreement, and that he understood the charges against him, the constitutional rights he was waiving, that the maximum sentence he could face. He stated that he was giving the no contest plea

5

of his own free will and was not a result of any force or threats against him.

The district attorney provided the factual basis for the plea, which he contended could be proved at trial. The government described facts which were consistent with Nieto's statements during his criminal trial, which were also consistent with his May 15, 1996 interview regarding which this Court has found there to be a fact issue regarding coercion. The district attorney said that on December 13, 1995, Plaintiffs came to Nieto's mother's home in Albuquerque to take him to the cabin in Torreon, New Mexico where Ben Anaya, Jr., Cassandra Sedillo, and her two young boys were staying. The threesome's agreed purpose was to rob Anaya and Sedillo and kill Popeleski. When they arrived, they interacted with the children and partied with Anaya and Sedillo, but Popeleski was not there. After dark, Plaintiffs and Nieto left the cabin and went to their vehicle, where they put on masks and armed themselves with guns. They waited and then returned to the cabin, hoping the occupants would be sleeping. On their way to the cabin they encountered Popeleski. Nieto ordered Popeleski to the ground and held him there while Plaintiffs went inside. Nieto heard gunshots coming from the cabin, and later Plaintiffs returned bearing drugs and additional firearms. Before they drove away, Buchner returned to the cabin and locked the door, knowing that the children were inside. Nieto made no objection to the factual basis set forth by the prosecutor, and pled no contest to two counts of second degree murder and one count of armed robbery. The state district court accepted his pleas, finding that they were knowingly, voluntarily, and intelligently given.

Here, the Defendants offer statements made at Nieto's plea hearing, and the plea itself, for their truth. They argue that the statements and the plea show that Plaintiffs in fact did shoot Anaya and Sedillo, and that Nieto's affidavit is entirely false. Thus, although the Court has previously held most of Nieto's affidavit to be a sham, Defendants ask the Court to disregard the limited portions

of Nieto's affidavit that it considered during its initial ruling, even though there is no new testimony by Nieto to contradict his statements regarding his education, background and the conditions under which he was questioned by Defendants.

Both parties assume, and the Court agrees, that statements by Nieto and his attorney at the plea hearing, as well as the plea itself, are hearsay—that is, they are out of court statements offered to prove the truth of the matter asserted, e.g., that Plaintiffs were the primary actors in the Torreon cabin murders. The parties have addressed the admissibility of Nieto's plea under various Rules of Evidence.

### 1. Rule 410

Plaintiffs argue that the evidence regarding Nieto's no contest plea are inadmissible and therefore should be excluded. As Defendants correctly note, the Federal Rules of Evidence govern the admissibility of Nieto's plea for summary judgment purposes. Rule 410 provides, in pertinent part:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible *against the defendant who made the plea* or was a participant in the plea discussions:
> . . .
> (2) a plea of nolo contendere;
> (3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or
> . . .
>
> However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

Fed. R. Evid. 410 (emphasis added).  Thus, the first part of the Rule outlines the circumstances in which evidence is not admissible.  It provides that evidence of (1) a plea of nolo contendere or any statement made in the course of plea proceedings (2) offered in a civil or criminal proceeding, and (3) offered against the defendant who made the plea, is not admissible into evidence.  Rule 410 has two purposes.  First, although a plea of nolo contendere has the same legal effect as a guilty plea, it is not a factual admission to the underlying crime, and therefore a defendant who otherwise would plead guilty may choose to take a nolo plea to prevent the plea from being used as an admission in a subsequent civil action.  *Rose v. Uniroyal Goodrich Tire Co.*, 219 F.3d 1216, 1220 (10th Cir. 2000).  The official comments to the Rule state that it "gives effect to the principal traditional characteristic of the *nolo* plea, i.e., avoiding the admission of guilt which is inherent in pleas of guilty."  Those comments further state that another purpose of the Rule is to promote the resolution of criminal cases by compromise, and that purpose is encouraged by "free communication . . . and security against having an offer of compromise or related statement admitted in evidence."  Finally, the comments make clear that "[l]imiting the exclusionary rule to use against the accused is consistent with the purpose of the rule, since the possibility of use for or against other persons will not impair the effectiveness of withdrawing pleas or the freedom of discussion which the rule is designed to foster."

In *Rose*, the plaintiff sued his former employer for wrongful discharge after entering a no-contest plea in a state court criminal proceeding for possession of marijuana. The plaintiff claimed that his termination for violating the company's anti-drug policy was against public policy and a breach of an implied employment contract.  The plaintiff brought a motion in limine to exclude all evidence of the no-contest plea based on Rule 410 of the Federal Rules of Evidence. The Tenth Circuit concluded that "we will not construe . . . Rule 410 . . . to allow an employee to

affirmatively prevent an employer from presenting the very evidence used as a basis for its termination decision. Such a result would unfairly hogtie the employer and lead the jury to believe that the employee's termination was groundless." *Id*. at 1220. As to Federal Rule of Evidence 410, the court found that the no-contest plea was "not being admitted 'against the defendant.' " *Id*. The Tenth Circuit reasoned that because Rose was the plaintiff in the lawsuit, the employer's defensive use of the plea was not "against the defendant" within the meaning of Rule 410. *Id*. (citing *Walker v. Schaeffer*, 854 F.2d 138, 143 (6th Cir. 1988)). Therefore, the *Rose* court allowed the admission of evidence of the plaintiff's no-contest plea to defend the wrongful termination charge.[2]

Under *Rose*, the evidence of Nieto's nolo contendere plea is admissible against the Plaintiffs. The first part of Rule 410 does not exclude the admission of the evidence here because it is not being offered against Nieto, who was the defendant, i.e., the "accused," who made the plea. Rather, it is being offered against the Plaintiffs. Thus, the purpose of Rule 410–that is, to encourage resolution of criminal cases through pleas–is not hampered by allowing the evidence to be used in a manner that is unfavorable to a third party. Second, as the Tenth Circuit made clear in *Rose*, the purpose for which the evidence is offered is also important. Here, as in *Rose*, the evidence is being offered in defense of claims, rather than being offered against the accused. Finally, in *Rose* the Tenth Circuit admitted the evidence to be used in a manner adverse to the interests of the pleader, who was a party to the civil case. Here, the pleader (Nieto) is not a party to this litigation and use of the evidence in no way affects his interests. Thus, under Rule 410 as interpreted and applied by the Tenth Circuit in *Rose*, the evidence of Nieto's nolo contendere plea is admissible for this court's consideration of the renewed motion for summary judgment.

---

[2] The *Rose* opinion does not address the impact, if any, of the hearsay rule on the admissibility of the plaintiff's prior plea.

**B.     ADMISSIBILITY OF POPELESKI LETTER**

The second piece of newly discovered evidence[3] upon which Defendants rely is an unsworn, undated letter from Shawn Popeleski's father to the judge who presided over his son's criminal trial. The letter contains information regarding Popeleski's upbringing, education, and juvenile criminal history. It appears that Defendants offer it for the truth of the matters asserted therein, and therefore it is hearsay. For that reason, Plaintiffs object to the Court considering the letter. Defendants failed to respond to that argument in their reply brief. As the parties offering the evidence, it is the Defendants' responsibility to demonstrate that it is admissible. Defendants have failed to meet that burden, and indeed the evidence appears to be inadmissible hearsay. Accordingly, the Court will not consider it here.

**III.    EFFECT OF NEW EVIDENCE**

**A.     SHAM AFFIDAVIT**

The Court has previously ruled that Nieto's Affidavit is a sham with regard to the facts of what occurred on the night of the murders because it contradicted his prior sworn testimony on those matters. However, applying the governing standard in the Tenth Circuit as outlined in *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986), the Court ruled that part of Nieto's Affidavit was admissible:

> Those portions of the affidavit include information regarding Nieto's age, educational background, learning disabilities, and physical condition during police questioning, as well as Nieto's assertions regarding Defendants' words and actions during the course of such questioning. The record reflects no prior inconsistent

---

[3] The Court uses this term loosely, as it appears that the letter has been in the district attorney's file for years, and the Defendants did not request it until September of 2008. Defendants have not explained why this evidence was not available to them in March of 2004, when they filed their original motion for summary judgment on qualified immunity grounds.

>sworn testimony on these subjects, and therefore the Court will consider these portions of Nieto's affidavit when determining whether there exists a genuine material fact for trial.

Memorandum Opinion and Order entered August 16, 2006 [Doc. No. 293] at 29.

Based on Nieto's nolo contendere plea, Defendants now ask the Court to expand this ruling to disregard Nieto's entire Affidavit. In making this argument, Defendants rely upon the Sixth Circuit's ruling in *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006), in which it adopted a two-step approach to the sham affidavit rule that differs from the Tenth Circuit's three-part test outlined in *Franks,* to wit, "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 1237. As the Defendants acknowledge, the Tenth Circuit's test in *Franks* requires that in order to be found a sham, an affidavit must directly contradict the witnesses sworn testimony.

Under *Aerel*, however, an affidavit that directly contradicts prior sworn testimony should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. *Aerel*, 448 F.3d at 908. If there is no direct contradiction, however, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue. *Id*. (citing *Franks*, 796 F.2d at 1237). According to the Sixth Circuit in *Aerel*, the *Franks* factors provide "a useful starting point for this inquiry," but the *Franks* factors are nonexhaustive. *Id*. at 908-09. The Sixth Circuit did not discuss what further factors it might consider in that regard. It did decline, however, to "transform the straightforward, objective inquiry needed to decide whether an affidavit contradicts deposition testimony into a more subjective evaluation of a party's prior opportunities during discovery to

present evidence and whether that party could have or should have been more forthcoming in her deposition. *Id.* at 909 (internal citations and quotations omitted).

Relying on *Aerel* and Nieto's nolo contendere plea, the Defendants urge the Court to adopt the Sixth Circuit's approach in *Aerel* and strike the remaining, unexcluded portions of Nieto's affidavit as an attempt to create a sham fact issue, even though he had not been asked about those facts in his prior sworn testimony or at his plea hearing, there is no indication that he attempted to conceal that information on any occasion, and there is no directly contradictory testimony on file before the Court.[4]  Certainly, Defendants enumerate many reasons why the remainder of Nieto's Affidavit is not credible. *See* Doc. No. 318 at 19-20.  However, Defendants cite to no Tenth Circuit law that would allow this Court to strike affidavit testimony on credibility grounds–particularly when this Court is generally prohibited from making credibility determinations on summary judgment and must view the evidence in the light most favorable to the Plaintiffs–or to strike affidavit testimony that was neither requested nor inquired about in prior or subsequent sworn testimony.  It may be that in the future the Tenth Circuit will adopt the approach advocated by Defendants and the Sixth Circuit.  However, *Franks* represents the current law regarding sham affidavits in the Tenth Circuit, and this Court is not persuaded that it applied *Franks* improperly.  Indeed, Defendants do not argue that the Court erred in this regard.  This portion of Defendants'

---

[4]In their response brief [Doc. No. 318 at 19], Defendants state that their position is that Nieto's entire affidavit has been contradicted by his actions in the September 19, 2007 plea and sentencing hearing conducted in New Mexico state district court.  However, Defendants fail to point to specific testimony by Nieto at the hearing that contradicts the remaining portions of the affidavit regarding Nieto's educational background and Defendants' conduct during the 1996 interviews, and the Court can discern none.  That Nieto entered a knowing, voluntary nolo contendere plea in 2007 does not necessarily contradict his statements about his age, education, and physical condition at the time of his 1996 witness interview, nor does it contradict his statements about Defendants' conduct during those interviews.

12

motion will be denied.

### B. COLLATERAL ESTOPPEL

Defendants contend that the doctrine of judicial estoppel should prevent Plaintiffs from relying on Nieto's Affidavit to defeat summary judgment. Defendants reason that the doctrine should apply to Plaintiffs, even though Nieto is a non-party, because (1) the Affidavit contradicts Nieto's sworn testimony about the murders, and therefore judicial estoppel would bar Nieto from relying on his Affidavit if he were a party, and (2) Nieto executed the Affidavit at the request of Plaintiffs' counsel, who they allege drafted the document. Thus, they argue that judicial estoppel should be applied to prevent Plaintiffs from perpetrating a fraud on the Court by using any portion of the Affidavit, even those portions regarding Nieto's background, education, physical condition during the May 1996 police questioning, and actions of Defendants during that questioning—none of which appear to be directly contradicted by any of Nieto's testimony or by his actions at the plea hearing.

Judicial estoppel is an equitable doctrine aimed at "protect[ing] the integrity of the judicial process by prohibiting *parties* from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citation and internal quotations omitted) (emphasis added). Where a party successfully asserts a position in a legal proceeding, he or she may not assert a contrary position in later proceedings "simply because his [or her] interests have changed." *Id*. at 749. While the doctrine is discretionary, the Tenth Circuit has applied it when three factors are met. *Id*. at 750. First, "a party's subsequent position must be clearly inconsistent with its former position." *Eastman v. Union Pacific R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (internal quotation marks omitted). Second, a party must succeed "in persuading a court to accept that party's former position, so that judicial acceptance of an

13

inconsistent position in a later proceeding would create the perception that either the first or second court was misled." *Id*. (emphasis, brackets, and internal quotation marks omitted). Third, the court must find that "the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped." *Id*. In evaluating these factors at summary judgment, the court must view the facts, and all reasonable inferences that can be drawn from them, in the light most favorable to the party against whom estoppel is sought. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008).

The circumstances of this case do not meet the criteria for applying judicial estoppel. First, Defendants are attempting to estop the Plaintiffs based on the change of position by Nieto, a non-party to this litigation. However, Defendants have not provided the Court with any authorities which support the use of the doctrine in this way. As outlined above, judicial estoppel is used against a party to the lawsuit when that same party asserts a contrary position in later proceedings. The doctrine does not estop a party to a lawsuit when a third party that has changed his position. Second, the party's subsequent position must be clearly inconsistent with its former position. Here, even if Nieto were a party, in his Affidavit Nieto did take an inconsistent position regarding what happened on the night of the murders. However, the Court never considered that portion of the Affidavit, and only considered the portions in which Nieto described his age, education, and physical condition at the time of his interrogation, as well as the actions of the Defendants during that interrogation. There is nothing in the record to suggest that Nieto has ever taken an inconsistent position on those matters. Indeed, they do not appear to have been addressed either at Nieto's trial or at his plea hearing. True, at his plea hearing Nieto did not object to the prosecutors recitation of facts regarding his and Plaintiffs' participation in the murders, and in 2007 he did enter a voluntary nolo contendere plea to the underlying crime, but that does not necessarily mean that

14

his statements at the time of his interrogation in May of 1996 were voluntary, even if they were true.

Throughout their motion and supporting briefs, Defendants suggest the following chain of logic: that because Nieto entered a voluntary nolo plea to the murders in 2007, and because he did not object to the prosecutor's recitation of facts at that plea hearing, then that version of events surrounding the murders must be true. (Or, at a minimum, Nieto has waived the right to argue that it is not true.) Defendants further suggest that because that version of events is consistent with the story that Nieto told when he was allegedly coerced, and because he voluntarily entered a nolo plea consistent with that same version of events, it must be true. From the foregoing, Defendants conclude that if that same version of events is true, then it must not have been coerced, and it was reasonable for them to rely on his statements to support probable cause to arrest Plaintiffs.

The Court does not find this argument to be persuasive. First, it suggests that the end result–in this case, an allegedly truthful witness statement–justifies what otherwise would be improper means, e.g., alleged coercion by law enforcement to obtain that statement. According to Defendants, one may have a claim against law enforcement officers for illegal coercion only if that alleged coercion led to false information. However, Defendants also suggest that such coercion is lawful if it leads to a truthful confession. Defendants cite no law in support of this novel proposition, and the Court is aware of none. As the Supreme Court explained in 1967, though coerced confessions are excluded because of their inherent unreliability, the right to be free from coercion and self-incrimination has a deeper origin:

> The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth. The roots of the privilege are, however, far deeper. They tap the basic stream of religious and political principle because the privilege reflects the limits of the individual's attornment to the state and—in a philosophical sense—insists upon the equality of the individual and the state. In other words, the

15

> privilege has a broader and deeper thrust than the rule which prevents the use of confessions which are the product of coercion because coercion is thought to carry with it the danger of unreliability. One of its purposes is to prevent the state, whether by force or by psychological domination, from overcoming the mind and will of the person under investigation and depriving him of the freedom to decide whether to assist the state in securing his conviction.

*In re Application of Gault*, 387 U.S. 1, 47 (1967).  Thus, it has long been clearly established that "the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude in our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'"  *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)).

As the Defendants have observed, the Supreme Court noted that coerced confessions are forbidden in part because of their "probable unreliability."  *Id.*, 378 U.S., at 385-386.  The Supreme Court has also long held that a Court may not look beyond coercion to determine whether a confession given under duress is actually truthful, as the Defendants suggest this Court do.  That is because a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession.  *Rogers v. Richmond*, 365 U.S. 534, 543-44 (1961).  The Supreme Court stated:

> [I]t had been settled when this Court decided *Jackson* that the exclusion of unreliable confessions is not the purpose that a voluntariness hearing is designed to serve.  The sole issue in such a hearing is whether a confession was coerced. Whether it be true or false is irrelevant; indeed, such an inquiry is forbidden. The judge may not take into consideration evidence that would indicate that the confession, though compelled, is reliable, even highly so.  As difficult as such tasks may be to accomplish, the judge is also duty-bound to ignore implications of reliability in facts relevant to coercion and to shut from his mind any internal evidence of authenticity that a confession itself may bear.

*Lego v. Twomey*, 404 U.S. 477, 484 n.12 (1972) (internal citations and quotations omitted). Defendants point to no authority which would justify a different rule in this civil case for alleged violations of civil rights.

Second, Defendants' argument lacks merit because they rely upon several events that occurred after the May 1996 interviews of Nieto and Popeleski to argue that their witness statements were reliable and therefore Defendants properly used the statements to support probable cause for Plaintiffs' arrest. The subsequent events that Defendants point to include an interview of Nieto conducted after Plaintiffs had already been arrested, Nieto's testimony at his own criminal trial, Popeleski's father's letter to the state district court, and Nieto's 2007 nolo contendere plea. However, as the Tenth Circuit explained in *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007)"[p]robable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime."). The inquiry "depends upon the reasonable conclusion to be drawn from the facts *known to the arresting officer at the time of the arrest*," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added), where supported by "reasonably trustworthy information." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Events that occurred after the arrest were not known to the Defendants and cannot support probable cause. Thus, Defendants' argument that these subsequent events demonstrate the reliability of Nieto and Popeleski's statements, and therefore support probable cause, is without merit.

Based on the record before it, the Court has previously analyzed the totality of the circumstances present in 1996 when Defendants questioned Nieto and Popeleski. Viewing that evidence in the light most favorable to the Plaintiffs, in its August 16, 2006, Memorandum Opinion and Order the Court found that a jury could conclude that those statements were coerced. Certainly,

17

ample evidence exists with which to challenge Nieto's credibility on the issue of coercion, and for the jury to conclude that the statements were not coerced. However, the credibility of witnesses and the weight of evidence are matters for the jury, not for the Court. Nieto's nolo contendere plea, made approximately eleven years after his initial interviews, does not alter that analysis.

## IV.   STATUTE OF LIMITATIONS

As their final argument, Defendants contend that Plaintiffs' claim under 42 U.S.C. § 1985(3) for conspiracy to violate their constitutional rights (Count III of the Complaint) should be dismissed as untimely. The threshold issue, raised by the Plaintiffs, is whether the Defendants have waived this argument by failing to make the argument when the Tenth Circuit remanded the case for consideration in light of *Wallace v. Kato*, 549 U.S. 384 (2007). The Court concludes that they have not waived the argument by failing to raise it at that time. After the Defendants took an interlocutory appeal of this Court's denial of qualified immunity, the Tenth Circuit remanded the case with specific instructions for this Court to consider the timeliness of Plaintiffs substantive due process (Count I) and malicious prosecution (Count II) claims under *Wallace*. The limited remand did not include Plaintiffs' Count III conspiracy claim, and therefore Defendants did not have an opportunity to raise their argument at that time. Because the Defendants have not waived the defense, the Court will address it on its merits.

In Count III, Plaintiffs have pled a Section 1985(3) claim for conspiracy to violate civil rights. The rights Plaintiffs alleged that Defendants conspired to violate include all of the underlying civil rights claims Plaintiffs have made in this case, of which only malicious prosecution remains. *See* Doc. No. 1 at 17 ("The purpose of the conspiracy was to obtain a false conviction of Plaintiffs based on false and coerced testimony. The conspiracy was essentially to cause a malicious prosecution."). As Defendants point out, favorable termination is an element of malicious

prosecution, but not an element of conspiracy. Rather, in order to prevail on a civil rights conspiracy claim, a plaintiff must show that two or more persons acted in concert, either to commit an unlawful act, or to commit a lawful act by unlawful means. *Singer v. Wadman*, 745 F.2d 606, 609 (10th Cir. 1984) (citing *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979), *rev'd in part on other grounds sub nom. Hanrahan v. Hampton*, 446 U.S. 754 (1980)). Because favorable termination is not an element of conspiracy, Defendants argue that Plaintiffs' conspiracy claim accrued before their malicious prosecution claim, i.e., when they were put on trial for the Torreon cabin murders in 1996, or when they filed motions in their respective criminal cases alleging that Nieto and Popeleski's statements were coerced—April of 1997 for Buchner, and June of 1999 for Wilkins.

Defendants' argument is surprising, particularly in light of the fact that in the same brief [Doc. No. 318 at 37], Defendants argue that in order to recover for conspiracy, a plaintiff must plead and prove an actual deprivation of rights. Defendants argue, "a conspiracy is not a separate actionable offense unless a valid actionable § 1983 claim can also be maintained." *Id*. at 37. This being the case, Plaintiffs could not have a cause of action for conspiracy to carry out a malicious prosecution until the malicious prosecution claim was itself ripe. That, of course, did not happen until Plaintiffs received favorable terminations in their criminal cases. Furthermore, Defendants' argument oversimplifies the matter. In *Wallace,* the Supreme Court observed that "it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." 549 U.S. at 388 (internal citations and quotations omitted). In the case of a claim for conspiracy to carry out a malicious prosecution such as the Plaintiffs are making in this case, it is impossible to have a complete and present cause of action until the putative plaintiff receives a favorable termination in the underlying prosecution. This is because the institution of legal process against another person is, generally speaking, a lawful act

unless carried out by unlawful means. One cannot make the determination of whether the means of prosecution were unlawful until the underlying claim for malicious prosecution has fully matured.

For example, if a plaintiff were required to file a civil rights claim for conspiracy to initiate a malicious prosecution *before* the favorable termination of the underlying criminal case, how would a court proceed in adjudicating such a claim? Would it be forced to stay the civil lawsuit until termination of the criminal proceeding in the plaintiff's favor? That makes little sense, as it would require a plaintiff to file a civil rights conspiracy claim but not allow him to pursuit it until a later time. Depending on the circumstances, the underlying criminal case might be pending for years, causing the conspiracy claim to languish. On the other hand, if the Court went forward with the conspiracy claim and plaintiffs prevailed, what would happen to that judgment if plaintiffs were later convicted in the underlying criminal proceedings? Presumably, it would invalidate the civil judgment in favor of the plaintiff on conspiracy to commit malicious prosecution. That too makes little sense and would be a waste of judicial resources.

In short, the Court concludes that Plaintiffs did not have a complete and present cause of action for conspiracy until they received favorable terminations in their criminal cases. Only then was it even possible for Plaintiffs to prove that Defendants used unlawful means to prosecute them for the Torreon cabin murders. Thus, Defendants' motion will be denied.

**IT IS THEREFORE ORDERED** that Defendants' joint renewed motion for summary judgment on qualified immunity based on newly discovered evidence [Doc. No. 318] is **DENIED.**

_____
**UNITED STATES DISTRICT JUDGE**